2011 WY 81

**MOUNTAIN CEMENT COMPANY, a Nevada corporation, Appellant (Plaintiff),**

v.

**The SOUTH OF LARAMIE WATER & SEWER DISTRICT, Appellee (Defendant).**

In the Matter of the Petition of Mountain Cement Company for the Exclusion from the South of Laramie Water and Sewer District.

**Mountain Cement Company, Appellant (Petitioner),**

v.

**The South of Laramie Water & Sewer District, Appellee (Respondent).**

Nos. S–10–0199, S–10–0238.

Supreme Court of Wyoming.

May 13, 2011.

Representing Appellant: Philip A. Nicholas & Mitchell H. Edwards of Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Nicholas.

Representing Appellee: Kermit C. Brown and Elisa M. Butler of Brown & Hiser LLC, Laramie, Wyoming. Argument by Mr. Brown.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] In these consolidated appeals, Mountain Cement Company, a Nevada corporation (Mountain Cement), challenges the district court's conclusions that Mountain Cement's property was properly included in the South of Laramie Water and Sewer District (the District) and that the District lawfully issued certain general obligation bonds, and also challenges the refusal of the Board of County Commissioners of Albany County (the Board) to exclude Mountain Cement's property from the District. Finding that Mountain Cement is barred from challenging the inclusion of its property in the District, and finding that the District's proposed general obligation bond issue was not unlawful, we affirm the district court in S–10–0199. In S–10–0238, we answer the certified questions as set forth below.[1]

### ISSUES IN S–10–0199

[¶ 2] 1. Whether the District had the authority to include Mountain Cement's property within the District's boundaries without Mountain Cement's written consent?

2. Whether the District's proposed general obligation bond issue for the purpose of improving and expanding the District's existing water system is in violation of law?

3. Whether the District's proposed general obligation bond issue for the purpose of improving and expanding the District's existing water system violates the District's statutory indebtedness limitation?

### ISSUES IN S–10–0238

[¶ 3] We have agreed to answer the following questions certified to this Court pursuant to W.R.A.P. 12.09(b):

1. Does a Wyoming board of county commissioners have the power and authority to remove real property from a water and sewer district?

2. If the answer to the first question is "yes," under what circumstances may a board of county commissioners remove property from a water and sewer district?

3. Does the Petition for Exclusion of Mountain Cement Company from the South of Laramie Water and Sewer District (the Petition), taking the facts alleged in the Petition as true and the allegations viewed in the light most favorable to Mountain Cement, state a claim upon which relief can be granted?

### FACTS

[¶ 4] The District was established by the Board in 1992.[2] The persons attempting to organize the District represented that the District would not levy property taxes, but would fund itself solely through user fees. Both the Petition submitted to the Board and the District's Amended Rules and Regulations provided that the District intended to fund its systems with user fees, and not to levy taxes. Since its inception, the District has obtained water pursuant to an Agreement for the City of Laramie to Furnish Municipal Water to the South of Laramie Water and Sewer District.

[¶ 5] Mountain Cement owns land south of the City of Laramie, with a portion of said land exceeding 20 acres in size lying within the District.[3] It is undisputed that, in 1992,

1. S–10–0238 is improperly postured before this Court because the parties mixed apples and oranges—a W.R.A.P. 11 certification of questions of law and a W.R.A.P. 12.09 review of agency action. Although we answered the questions as if the case was the former, it is in reality the latter.

2. The word "District" will refer either to the legal entity or its geographic boundaries, as the context suggests.

3. The portion of Mountain Cement's property lying within the District was obtained from different grantors and at different times, but, while the detailed facts of these transactions, as well as

Mountain Cement's plant manager signed a petition favoring organization of the District, but that no one with actual authority ever consented in writing to Mountain Cement's inclusion in the District. It is also undisputed that Mountain Cement obtains no water or other services from the District.[4]

[¶ 6] In October 2008, Mountain Cement learned from the Albany County Assessor that the District intended to levy a tax for the 2009 tax year against property lying within the District. On January 29, 2009, Mountain Cement filed in the district court the Complaint that underlies this Court's case no. S–10–0199. The Complaint alleged eight claims or causes of action, some being in the alternative:

Claim I: Declaratory Judgment & Affirmative Relief
(MCC's Property Not Properly Included w/in District)

Claim II: Estoppel
(Tax Assessment & General Obligation Bonds)

Claim III: Declaratory Judgment & Affirmative Relief
(Signatures Invalid for Fraud in the Inducement)

Claim IV: Declaratory Judgment & Affirmative Relief
(Tax Resolution Invalid)

Claim V: Declaratory Judgment & Affirmative Relief
(Bond Issue Invalid)

Claim VI: Declaratory Judgment & Affirmative Relief
(Tax Assessment & General Obligation Bond Violation of Equal Protection)

Claim VII: Declaratory Judgment & Affirmative Relief
(Tax Assessment & General Obligation Bond Violation of Due Process)

Claim VIII: Declaratory Judgment & Affirmative Relief
(Tax Assessment Unconstitutional Taking of Private Property)

[¶ 7] A day after the above-described Complaint was filed in the district court, Mountain Cement filed with the Board the Petition mentioned above. This Petition, which underlies this Court's case no. S–10–0238, contained the same allegations found in the Complaint, but sought relief under Wyo. Stat. Ann. § 41–10–120 (LexisNexis 2007) and Wyo. Stat. Ann. § 22–29–307 (LexisNexis 2007), as will be discussed more fully below.

## DISPOSITION BELOW

[¶ 8] On March 26, 2009, the District filed in the district court a motion to dismiss Mountain Cement's Complaint, citing W.R.C.P. 12(b)(6). The gravamen of a "12(b)(6) motion" is that there has been a "failure to state a claim upon which relief can be granted[.]" Both parties filed memoranda of law, after which the motion was heard on August 5, 2009. The district court issued a Decision Letter on September 8, 2009, and an order on September 22, 2009, dismissing all but Claim IV (Tax Resolution Invalid) and Claim V (Bond Issue Invalid), leaving those claims for further development.

[¶ 9] On November 9, 2009, the District filed a motion seeking summary judgment under W.R.C.P. 56 on Claims IV and V. Mountain Cement filed its response on January 7, 2010, and the matter was heard on April 2, 2010. In separate decision letters issued April 20, 2010, and July 8, 2010, the district court granted the District's motion on both counts. A final order disposing of all eight claims in the District's favor was entered on August 3, 2010. The appeal from that order was docketed in this Court as S–10–0199.

[¶ 10] While the district court action proceeded as described above, the Petition Mountain Cement had filed with the Board was also being considered. In the Petition, the factual allegations of which generally tracked those set forth in the district court

___

the history of Mountain Cement's corporate structure, have been detailed in the pleadings, neither party has shown that these facts implicate the issues in this appeal.

4. There is, however, a "reserved" water tap on property now owned by Mountain Cement, that parcel being known as the "Dodge Property."

Complaint, Mountain Cement sought to have its property "excluded," meaning "removed," from the District. After certifying three questions of law to the district court and receiving the district court's responses thereto, the Board dismissed the Petition for failure to state a claim upon which relief can be granted. Mountain Cement then filed in the district court a petition for review of the Board's order. Upon the parties' stipulated motion, the district court certified to this Court the same three questions that the Board had certified to it. Those questions have been listed hereinabove. *See supra* ¶ 3. In their briefs to this Court, the parties have focused primarily upon the question of whether Mountain Cement's Petition was time barred by the provisions of § 41–10–120 and § 22–29–307.

## STANDARDS OF REVIEW

[¶ 11] Review of a dismissal under W.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted is *de novo*, with this court applying the same standards and examining the same materials as the district court. *Swinney v. Jones,* 2008 WY 150, ¶ 6, 199 P.3d 512, 515 (Wyo.2008). "We accept the facts alleged in the complaint as true and view them in the light most favorable to the non-moving party. Dismissal is appropriate only if it is certain on the face of the complaint that the plaintiff cannot assert any facts that create entitlement to relief." *Id.* Dismissal is granted sparingly because it is a drastic remedy, but dismissal is proper where, for instance, the complaint clearly shows that the action is barred by a statute of limitations. *Id.; Simon v. Teton Bd. of Realtors,* 4 P.3d 197, 200 (Wyo.2000); *Gillis v. F & A Enters.,* 934 P.2d 1253, 1255 (Wyo. 1997).

[¶ 12] Review of a grant of summary judgment under W.R.C.P. 56(c) is similar to review of a dismissal under W.R.C.P. 12(b)(6):

> On appeal, this Court evaluates the propriety of a district court's summary judgment ruling by examining the same materials and following the same standards as the district court. We examine the record de novo in the light most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences which may be fairly drawn from the record. If upon review of the record, doubt exists about the presence of genuine issues of material fact, we resolve that doubt against the party seeking summary judgment. We review questions of law de novo without giving any deference to the district court's determinations. If we can uphold summary judgment on any proper legal basis appearing in the record, we will.

*Heimer v. Antelope Valley Improvement & Serv. Dist.,* 2010 WY 29, ¶ 14, 226 P.3d 860, 863 (Wyo.2010) (quoting *Wagner v. Reuter,* 2009 WY 75, ¶ 11, 208 P.3d 1317, 1321–22 (Wyo.2009) (internal citations omitted)). "Summary judgment may be the appropriate resolution in a declaratory judgment action." *Coffinberry v. Bd. of County Comm'rs of the County of Hot Springs,* 2008 WY 110, ¶ 3, 192 P.3d 978, 979 (Wyo.2008).

[¶ 13] These appeals largely involve statutory interpretation, for which the following standards apply:

> In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed *in pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia.* When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. *Wyoming Board of Outfitters and Professional Guides v. Clark,* 2001 WY 78, ¶ 12, 30 P.3d 36, [41] (Wyo.

2001); *Murphy v. State Canvassing Board,* 12 P.3d 677, 679 (Wyo.2000). Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation. *Billis v. State,* 800 P.2d 401, 413 (Wyo.1990) (citing *McGuire v. McGuire,* 608 P.2d 1278, 1283 (Wyo.1980)).

. . . .

*Loberg v. Wyo. Workers' Safety & Comp. Div.,* 2004 WY 48, ¶ 5, 88 P.3d 1045, [1048] (Wyo.2004) (quoting *Board of County Comm'rs of Teton County v. Crow,* 2003 WY 40, ¶¶ 40–41, 65 P.3d 720, [733–34] (Wyo.2003)). Only if we determine the language of a statute is ambiguous will we proceed to the next step, which involves applying general principles of statutory construction to the language of the statute in order to construe any ambiguous language to accurately reflect the intent of the legislature. If this Court determines that the language of the statute is not ambiguous, there is no room for further construction. We will apply the language of the statute using its ordinary and obvious meaning.

*BP Am. Prod. Co. v. Dep't of Revenue,* 2005 WY 60, ¶ 15, 112 P.3d 596, 604 (Wyo.2005).[5]

## DISCUSSION

### *Whether the District had the authority to include Mountain Cement's property within the District's boundaries without Mountain Cement's written consent?*

[¶ 14] This issue was the subject of Claim I of the Complaint, in which Mountain Cement sought a declaration from the district court that neither Mountain Cement nor its predecessors in interest to the lands included within the District had consented to that inclusion, and that, therefore, those lands are not included in the District. The district court dismissed this claim under W.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted, so we will review

that decision using the appropriate standard set forth above.

[¶ 15] Mountain Cement contends that the Board's inclusion of Mountain Cement's property within the district was void *ab initio* because it violated the provisions of Wyo. Stat. Ann. § 41–10–102(c) (LexisNexis 2009), which provisions are the same as when originally enacted in 1959 Wyo. Sess. Laws, ch. 188, § 2 at 261, and which read as follows:

(c) No tract of twenty (20) acres or more shall be included in any district without the written consent of each person having legal (as distinguished from equitable) title to the tract.

[¶ 16] As mentioned above, no corporate officer or director or other representative with actual authority to do so ever gave written consent to inclusion of Mountain Cement's property in the District. *See supra* ¶ 5. Mountain Cement also avers that written consent similarly was not obtained from the legal owners of the "Dodge property" and the "Silva property" now owned by Mountain Cement and included in the District.

[¶ 17] The district court dismissed Claim I on two grounds raised by the District. First, the district court found that Mountain Cement's Complaint violated the provisions of Wyo. Stat. Ann. § 41–10–107(g) (LexisNexis 2009), which was in effect at the time the District was organized in 1992. That statutory section provides as follows:

(g) A resolution of the board of county commissioners establishing the district shall be considered final and no petition in error nor other appeal shall lie therefrom. The resolution of the board of county commissioners shall finally and conclusively establish the regular organization of the district against all persons except the state of Wyoming, in an action in the nature of a writ of quo warranto, commenced by the attorney general within thirty (30) days after the resolution declaring the district as organized and not otherwise. The or-

---

5. We have not distinguished in this discussion, nor will we later in this opinion, between the concept of "interpreting" a statute and the concept of "construing" a statute, but have used the concepts interchangeably. If a distinction be-

tween the two concepts should be made, we will leave that for a later day. *See* 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 45:4, at 27 (7th ed. 2007).

ganization of the district shall not be directly or collaterally questioned in any suit, action or proceeding except as expressly authorized in this subsection.

[¶ 18] In reaching its conclusion, the district court reasoned as follows:

At the end of the day, however, this Court is persuaded that the statute that prohibits direct or collateral attacks against the organization of a district in "any suit, action or proceeding" reflects the Wyoming Legislature's intent to shield a district from suit on the grounds that said districts must have the ability to pursue financing, incur indebtedness, and construct projects without fear of persons having the later ability to "opt out" of the District whenever they are unhappy with the District's decisions. The formation of water and sewer districts is very much a front-loaded procedure geared toward establishing conclusive finality to the proceedings once a district is formed.

And, frankly, the "organization" of a district very much includes the membership of that district and the consequent boundaries of the district. The ability to challenge the district's boundaries or membership many years in the future, as is the case here, would greatly hinder a district's ability to secure financing. That is exactly what Mountain Cement is attempting to do in the case at bar and exactly what the statute prohibits. For that reason, the Court concludes that Mountain Cement is estopped from challenging the formation of The District, including its inclusion therein.

[¶ 19] The District's "fall back" position on this issue, in the event the district court did not accept its argument based upon § 41–10–107(g) was that the Complaint was barred by the ten-year statute of limitations found in Wyo. Stat. Ann. § 1–3–109 (LexisNexis 2009). That statute provides that "[a]n action for relief, not hereinbefore provided for, can only be brought within ten (10) years after the cause of action accrues." The district court agreed with the District, opining that Mountain Cement had imputed knowledge of its inclusion in the District by July 1992, at the latest, when notices were published including Mountain Cement's property in the District, and more likely had actual knowledge of such when Mountain Cement's plant manager signed the Petition on April 23, 1992.

[¶ 20] We will affirm the district court's dismissal of Claim I under W.R.C.P. 12(b)(6), for several reasons. First, a motion to dismiss under W.R.C.P. 12(b)(6) is an appropriate vehicle in which to raise the issue of the passage of a period of limitations. *See, e.g., Corkill v. Knowles*, 955 P.2d 438, 440–41 (Wyo.1998); *Gillis*, 934 P.2d at 1254–55; and *Boller v. Western Law Assocs., P.C.*, 828 P.2d 1184, 1186 (Wyo.1992). Second, § 41–10–107(g) unambiguously forbids any "petition in error [or] other appeal" from a board's resolution establishing a water district, and unambiguously states that the "organization of the district shall not be directly or collaterally questioned in any suit, action or proceeding" except "an action in the nature of a writ of quo warranto, commenced by the attorney general within thirty (30) days after the resolution . . . ." Third, there is no inherent right to appeal from administrative action; rather, any such right is limited as described in the statute. *Holding's Little Am. v. Bd. of County Comm'rs of Laramie County*, 670 P.2d 699, 702 (Wyo. 1983) (and cases cited therein); *United States Steel Corp. v. Wyo. Envtl. Quality Council*, 575 P.2d 749, 750 (Wyo.1978); 2 Am.Jur.2d *Administrative Law* §§ 405, 409 (2004).

[¶ 21] This case is quite similar to *State ex rel. Speer v. District Court for Sierra County*, 79 N.M. 216, 441 P.2d 745 (1968), wherein the holder of bonds issued by a sanitation district sought an order directing the court to proceed no further in an action considering the validity of the formation of the district. The opinion written by the New Mexico Supreme Court is broad and instructive, and we will quote at length therefrom:

Although relator advances four reasons for making the writ permanent, we perceive that we need only notice and discuss one. Our attention is directed to the following appearing in § 8, Ch. 80, N.M.S.L. 1943 (now, with minor changes, § 75–18–8(H), N.M.S.A.1953):

"If an order be entered establishing the district such order shall be deemed final and no appeal or writ of error shall lie therefrom, and the entry of such order shall finally and conclusively establish the regular organization of the said district against all persons except the State of New Mexico, in an action in the nature of a writ of quo warranto, commenced by the attorney general within thirty days after said decree declaring such district organized as herein provided, and not otherwise. The organization of said district shall not be directly or collaterally questioned in any suit, action or proceeding except as herein expressly authorized."

Respondent would avoid the literal application of the section by an argument that it could not have been the intention of the legislature in adopting the quoted language to thereby deprive courts of their inherent power to vacate a judgment obtained by fraud on the court.

In this connection it might be observed that he is proceeding as if Rule 60(b) (§ 21–1–1(60)(b), N.M.S.A. 1953) were applicable. A reading of the rule discloses that final judgments may be reopened because of fraud only if the motion to do so is made within a year after entry of the judgment. However, specific provision is made for courts to entertain independent actions for relief from judgments because of fraud upon the court. The Freedmans and Recreations Unlimited are evidently relying on this provision in making their attack on the 1961 order holding the district to be legally organized.

In support of their argument they cite those holdings by this court to the effect that we will not adopt an interpretation of a statute which will make its application unreasonable and absurd. *See Montoya v. McManus*, 68 N.M. 381, 362 P.2d 771 (1961); *Hahn v. Sorgen*, 50 N.M. 83, 171 P.2d 308 (1946); *Nye v. Board of Com'rs of Eddy County*, 36 N.M. 169, 9 P.2d 1023 (1932). What they fail to do is to show wherein the statute is ambiguous or requires interpretation and, further, how a holding that it limits the time for attack on the ground of fraud results in absurdity or

unreasonableness. In our view, neither is true. How the language could have been made much clearer is difficult to imagine. It says specifically that the order establishing the district is final and not appealable, and finally and conclusively establishes that the district has been regularly organized, subject only to attack by the state through quo warranto during a period of 30 days. No exception is made for claims of fraud. If this were not enough, it adds that with this single exception the organization of the district may not be directly or collaterally brought into question. Again—no mention of an additional exception for fraud.

Neither do we agree that to give the statute this effect is in any sense unreasonable or absurd. To the contrary, the reasons for doing so are cogent and compelling. These we perceive to be to make possible the borrowing of money with assurance to the lenders that they are dealing with a qualified borrower which, in turn, would have the effect of reducing the rate of interest which would have to be paid on money obtained for public improvements. That this is a proper consideration was recognized by this court in *Oliver v. Board of Trustees of Town of Alamogordo*, 35 N.M. 477, 480, 1 P.2d 116, 118 (1931), where we find the following said:

" * * * Independently of said section, the right would exist in any interested party to resort to equity to stay the threatened action, if facts warranting the exercise of equitable jurisdiction were shown to exist. And but for said section such right would inhere, not alone for the thirty-day period limited in the act, but for the normal statutory period of limitation applicable to such a suit, unless lost by the existence of facts creating an equitable estoppel.

"Short periods of limitations on the right to attack proceedings such as these are present almost invariably in legislation of this kind. 5 McQuillin, *Municipal Corp.* (2d Ed.) pp. 826 and 854. The reason therefor is well stated by the court in the case of *Edmonds v. Town of*

*Haskell,* 121 Okl. 18, 247 P. 15, 19 [ (1926) ], where it said:

" 'This statute has a twofold purpose, and a twofold effect, viz: That of stabilizing and maintaining the credit of a town in the commercial world, and thereby benefitting property owners by maintaining a sound credit for their town, and on the other hand it carries assurance to contractors and investors in town securities that the legal obligations of the town must be met.'

"Such provisions are usually designated in the decisions as statutes of limitations. *Plagman*[*n*] *v. City of Davenport,* 181 Iowa 1212, 165 N.W. 393 [ (1917) ], and *McKone v. City of Fargo,* 24 N.D. 53, 138 N.W. 967 [ (1912) ]. * * * "

More directly in point is *In re Dexter–Greenfield Drainage District,* 21 N.M. 286, 310, 154 P. 382, 389 (1915), where we also find acceptance of a literal application of a short limitation period for review and the reasons therefor, in the following:

"The above and foregoing review of the drainage law and of the proceedings of this case are sufficient to show that the appellant in this case undertook to raise the question of the sufficiency of the petition at a time long after the time provided for by the statute. The act provides a full and fair opportunity for all interested parties to appear and raise the very question which the appellant undertook to raise at another and later time. Undoubtedly, from a practical standpoint, it was the intention of the Legislature to have these questions determined before the expenditure of large sums of money in the making of the survey and preparation of the plans, profiles, and specifications, as provided in section 39 above referred to. We are of the opinion that the orders of the court entered in this proceeding, finding at the conclusion of the hearing provided by law for that purpose that the petition was sufficiently signed, as above indicated, * * * and the same could not be attacked in any method whatever, except as provided by the statute, to wit, by appealing from the order sustaining the petition within 30 days from the entry thereof, and that any other method of attack, whether in the same proceeding, or in any other proceeding, constitutes a collateral attack, and is unavailable."

Further, after citing and quoting from *People v. Waite,* 213 Ill. 421, 72 N.E. 1087 (1904); *O'Neill v. Yellowstone Irrigation District,* 44 Mont. 492, 121 P. 283 (1912), and *Miller v. Perris Irrigation District,* 85 F. 693 (C.C.S.D.Cal.1898), to which cases we also refer, the court had the following to say, at page 312 of 21 New Mexico Reports, at page 390 of 154 Pac.:

" * * * It is the law that confers the jurisdiction, and not the court, and public policy requires that where the jurisdiction of the court, as provided by statute, is based upon the ascertainment and determination of certain facts, and a full and fair opportunity is given to all parties interested to be heard thereon, and a right of appeal afforded final determination of those facts, constitutes res adjudicata and cannot be inquired into at any other time, or by any other method than that provided by the statute. If this were not true, and the practice adopted by the appellant in this case were allowed, parties could remain silent until vast amounts of money were expended in the construction of these drainage districts, and then come forth and raise these facts and cause a possible waste of this money, when they might just as well have raised it before the expenditure."

. . . .

*Burns v. District Court of the Eighteenth Judicial District,* 144 Colo. 259, 356 P.2d 245 (1960), is a recent case we have found and is of particular interest because the limitation period and method for attacking organization of a recreation and park district in Colorado is in almost identical language to that contained in § 75–18–8(H), supra.

The action was an original proceeding in the nature of certiorari in the Supreme Court to obtain review of the District Court's action in establishing the district and sought a declaration that it was null

and void. The decree establishing the district was entered October 30, 1959. Thereafter, before the passage of 30 days, a request was made for the attorney general to institute quo warranto proceedings. He refused. The petition in certiorari was filed on December 29, 1959. The limitation statute was held to effectively prevent the petitioners from attacking the organization through certiorari. The announced reason was the "need for accelerating contract negotiations and the taking of other action looking to accomplishing the purposes of the district, free of the fear of subsequent attack of the district's legal existence."

Although the attacks on the organization were not based on alleged fraud, they were not materially different in that they asserted shortcomings in the form of the petitions, failure to take evidence, defects in the notice, and other similar matters. The Colorado court announced no exceptions to the application of the statute.

. . . .

Although our decision is based on the fact that the action was not commenced within the time provided by the applicable statute, we should observe that quo warranto by the attorney general is the only method for getting a review and determination of the court's action in entering its order pursuant to § 75-18-8(G), supra.

*Id.* at 747–50; *see also Luke v. Cataldi,* 883 A.2d 1114, 1119 (Pa.Commw.Ct.2005) (conditional use permit not considered void *ab initio* where challenge to permit not timely presented); *State ex rel. Condon v. City of Columbia,* 339 S.C. 8, 528 S.E.2d 408, 411–12 (S.C.2000) (90–day period of limitations in annexation statutes applies because more specific statute of limitations prevails over any general one; thus, even a *quo warranto* action is barred if untimely filed); *State ex rel. King v. Village of Praethersville,* 542 S.W.2d 578, 580–81 (Mo.Ct.App.1976) (*quo warranto* proceedings dismissed under theory of laches despite fact that incorporation of a village was unquestionably improper, where village had existed for 22 years and had become a recognized governmental entity).

[¶ 22] We agree entirely with this reasoning and find that it applies with equal logic to Mountain Cement's belated attempt to have the district court declare the Board's decision void *ab initio.* Mountain Cement's argument could have been presented to the Board before it declared the District to be organized, and the argument could have been presented to the attorney general in seeking a *quo warranto* proceeding. Alternatively, Mountain Cement could have filed a petition with the Board, pursuant to Wyo. Stat. Ann. § 41–10–107(b) (Michie 1983), to have its property excluded from the District prior to issuance of the Board's order establishing the District.[6]

[¶ 23] Mountain Cement's allegation that the Board's action was *ultra vires* and therefore void *ab initio* is nothing more than an attack upon the Board's determination of the validity of the Petition seeking formation of the District. That allegation is barred not only by the strict period of limitation found in § 41–10–107(g), but also by the *quo warranto* requirement of the same statutory section.

[¶ 24] Because we affirm the district court's dismissal of Claim I of Mountain Cement's Complaint on the above ground, we need not consider the issue of whether the period of limitations found in § 1–3–109 was also exceeded.

### *Whether the District's proposed general obligation bond issue for the purpose of improving and expanding the District's existing water system is in violation of law?*

[¶ 25] The District planned to fund its improvement project by issuing general obligation bonds in the amount of $660,000.00, which bonds would accrue interest at 7 percent per annum, maturing in 30 years. On February 7, 2008, the District passed a resolution to levy an 8–mill tax on property within the District for the purpose of repaying the bonds. As noted above, two of Mountain Cement's claims survived dismissal: Claim IV, which challenged the District's tax resolution, and Claim V, which sought a declara-

---

**6.** Section 41–10–107(b) was repealed in 1998. 1998 Wyo. Sess. Laws, ch. 115, § 5 at 824.

tion that the bond issue was invalid. *See supra* ¶ 8. Those claims were later determined against Mountain Cement via summary judgment. The present issue, arising out of Claim V, was determined by the district court in a decision letter dated April 20, 2010. The determination of that issue is primarily a question of statutory interpretation, requiring a journey through numerous statutes.[7] We will begin that process by setting forth Mountain Cement's position.

[¶ 26] Chapter 10 of Title 41 of the Wyoming Statutes is entitled Water and Sewer District Law. Wyo. Stat. Ann. § 41–10–103(a) (LexisNexis 2009) authorizes a board of county commissioners to establish water and sewer districts. Once a district has been established, Wyo. Stat. Ann. § 41–10–113(a)(xii) (LexisNexis 2009) grants it the following authority: "To borrow money and incur indebtedness and other obligations and evidence the same by certificates, notes or debentures, and to issue bonds, in accordance with the provisions of this act[.]" In turn, Wyo. Stat. Ann. § 41–10–124(a) (LexisNexis 2009) delineates the types of securities available to a district to evidence the borrowing of money:

> (a) A district may borrow money and issue the following securities to evidence such borrowing:
>> (i) Short-term notes;
>> (ii) General obligation bonds and other like securities;
>> (iii) Revenue bonds and other like securities; and
>> (iv) Special assessment bonds and other like securities.

[¶ 27] The focal point of the present issue is the language of Wyo. Stat. Ann. § 41–10–128 (LexisNexis 2009), which reads in its entirety as follows:

> **§ 41–10–128. Borrowing money and issuing bonds for purpose of acquiring or improving water or sewer system or other income-producing project.**
>
> A district in pursuance of a resolution may borrow money, issue bonds, or otherwise extend its credit for the purpose of acquiring or improving a water or sewer system, or other income-producing project; ***provided that the bonds or other obligations shall be made payable solely out of the net revenues derived from the operation of the system or other such project;*** and the systems and projects may be combined, operated and maintained as joint systems or projects, in which case the bonds or other obligations shall be made payable solely out of the net revenues derived from the operation of the joint systems or projects. No revenue bonds or other like securities shall be issued unless the issuance thereof has been submitted to a vote of the electors and approved by a majority of the qualified taxpaying electors voting on the question and by a majority of other qualified electors voting thereon, or, if no ballots are cast in one (1) of the ballot boxes and a majority of the ballots in the other ballot box favor the issuance of such bonds or other like securities, approved either by a majority of the qualified taxpaying electors voting thereon or by a majority of the other qualified electors voting thereon, as the case may be, at an election held as provided for bond elections by the Political Subdivision Bond Election Law, W.S. 22–21–101 through 22–21–112.

(Emphasis added.) It is Mountain Cement's position that the above-emphasized language specifically limits the District to the issuance of revenue bonds, rather than general obligation bonds, under these circumstances.

[¶ 28] The district court employed the following logic in disagreeing with Mountain Cement and in granting summary judgment to the District. First, citing §§ 41–10–113 and 41–10–124, the district court noted the general authority of districts to incur debt and to issue bonds. Next, the district court concluded as follows in regard to the first sentence of § 41–10–128:

> As used in the first sentence of Section 128, one *could* (but is not necessarily required to) conclude that the word "bonds" could apply to revenue bonds *and* general

---

7. We will refer to the 2009 version of each statute, unless a different version was in effect at the relevant time during this controversy.

obligation bonds. However, this conclusion defies logic given the fact that the remainder of that same sentence mandates that the "bonds" be repaid out of net revenues, a requirement generally applicable only to revenue bonds. It would seem, then, that the term "bonds" does not include general obligation bonds which, by definition, are repaid from *ad valorem* property taxes.

(Emphasis is original.)

To these comments, the district court appended a footnote in which it surmised that "[t]he conclusion that Wyoming Statute § 41–10–128 is intended to be limited to "revenue bonds" is bolstered by the sentence within that statute that refers specifically to revenue bonds."

[¶ 29] The reader might conclude at this point that the district court had found the statute to be unambiguous, and that the statute limits districts to the use of revenue bonds when acquiring or improving a water system. But the above-quoted language from the decision letter directly precedes the following:

Further, to read the statute as Mountain Cement would ask would leave a district with virtually no ability to create its water supply system in the first place, as the construction of the initial system surely would meet the definition of "acquiring or improving a water or sewer system," thus meaning that any foundling district would be required to pay for the new construction or purchase of its water system *solely* from revenues collected from that system. Practically speaking, this limitation would nullify a district's ability to acquire or build an initial water supply system.

Taken as a whole, Wyoming Statute § 41–10–128 is ambiguous and requires

this Court to delve further in its quest for a proper statutory interpretation.

In other words, the district court found the language of the statute, in and of itself, to be unambiguous, but then found the statute to be ambiguous based upon its possible application.[8]

[¶ 30] Having found § 41–10–128 ambiguous, the district court sought to determine legislative intent first by looking to the statute's origin in 1959 Wyo. Sess. Laws, ch. 188, §§ 24–28, at 277–78, where the following related sections are found:

### Forms of Borrowing—Exemption From Taxation

**Section 24.** A district may borrow money and issue the following securities to evidence such borrowing:

Short-term notes;

General obligation bonds and other like securities;

Revenue bonds and other like securities; and

Special assessment bonds and other like securities.

. . . .

### Short–Term Notes

**Section 25.** A district, upon the affirmative vote of four directors, is hereby authorized to borrow money without an election in anticipation of the collection of taxes or other revenues and to issue short-term notes to evidence the amount so borrowed. Such short-term notes shall be payable from the fund for which the money was borrowed; shall mature before the close of the fiscal year in which the money is borrowed; and shall not be extended or funded except in compliance with Section 26, "General Obligation Bonds" of this Act.

### General Obligation Bonds.

8. Later in its decision letter, in a section entitled "Public Policy Behind Wyoming Statute § 41–10–128," the district court further explained this reasoning:

Another point bears mentioning here: Most of the water and sewer districts in Wyoming are relatively small. They generate sufficient income from their systems to maintain and operate those systems. However, the high up-front costs necessarily incurred in the construction and/or acquisition of water and sewer systems

would preclude such initial construction and/or acquisition of such systems if the districts were limited solely to their revenue stream to pay those initial costs. Absent the ability to access property tax revenues and to issue general obligation bonds, many, if not most, of the water and sewer districts in Wyoming simply could not construct or acquire water or sewer systems.

This statement is not supported by citation to any authority or to the record.

**Section 26.** No bonds or other evidences of indebtedness payable in whole or in part from the proceeds of general (ad valorem) property taxes or to which the full faith and credit of a district are pledged, shall be issued, except in pursuance of a resolution, nor until the question of their issuance shall at a special or biennial election be sumbitted [sic] to a vote of the electors and approved by a majority of the qualified taxpaying electors voting on the question and by a majority of other qualified electors voting thereon, in the maner [sic] provided by Article 6, Chapter 31, Wyoming Compiled Statutes, 1945, as from time to time amended.

**Limitation on Indebtedness**

**Section 27.** The aggregate amount of bonds or other evidences of indebtedness shall not exceed six per centum of the assessed value of the taxable property within the district as shown by the last preceding general assessment; provided, however, that in determining the amount of indebtedness, there shall not be included within the computation, bonds or other evidences of indebtedness outstanding or authorized to be issued for supplying water to the district, short-term notes, special assessment securities, or securities payable solely from the net revenues of an income-producing system or other project.

**Revenue Bonds.**

**Section 28.** A district in pursuance of a resolution may borrow money, issue bonds, or otherwise extend its credit for the purpose of acquiring or improving a water or sewer system, or other income producing project; provided that the bonds or other obligations shall be made payable solely out of the net revenues derived from the operation of such system or other such project; and such systems and projects may be combined, operated and maintained as joint systems or projects, in which case such bonds or other obligations shall be made payable solely out of the net revenues derived from the operation of such joint systems or projects. No revenue bonds or other like securities shall be issued unless the issuance thereof has been submitted to a vote of the electors and approved by a majority of the qualified taxpaying electors voting on the question and by a majority of other qualified electors voting thereon, in the manner provided by Article 6, Chapter 31, Wyoming Compiled Statutes, 1945, as from time to time amended.

[¶ 31] From the format and organization of these sections, the district court reached the following conclusions:

In large part, the statute stood then as it does today. And, as it originated, the Act followed a logical sequence of specifying the various methods by which a district could finance its projects.

. . . .

In reviewing the original form of the Act, it becomes apparent that Sections 24–28 were intended to address the various means by which a district could incur indebtedness and/or otherwise finance its projects. Revenue bonds were only one such option. And, while "revenue bonds" are limited to being issued for the "purpose of acquiring or improving a water or sewer system, or other income producing project," the contrary is not true under the Act: Revenue bonds are *not* the *only* means a district has of financing such projects.

(Emphasis in original.) To make it more clear, we will re-state what we believe to be the district court's interpretation of the relevant portions of the above sections. First, Section 26 does not prohibit the use of general obligation bonds to finance the acquisition or improvement of a water or sewer system. Second, the phrase "provided that the bonds or other obligations shall be made payable solely out of the net revenues" in Section 28 applies only to revenue bonds. In other words, under the district court's reading of these sections, a district may fund a water system acquisition or improvement project either through general obligation bonds, or through revenue bonds, but if done by the latter, the bonds must clearly state that they are payable solely out of revenue from the project.

[¶ 32] To bolster this interpretation of § 41–10–128, the district court cited other sections of the Water and Sewer District

Law. For instance, Wyo. Stat. Ann. § 41–10–115 (LexisNexis 2009) provides in pertinent part as follows:

> To levy and collect taxes, the board shall determine, in each year, the amount of money necessary to be raised by taxation, taking into consideration other sources of revenue of the district, and *shall fix a rate of levy, which,* when levied upon every dollar of assessed valuation of taxable property within the district, and together with other revenues, *will raise the amount required by the district annually to supply funds for paying expenses of organization and the costs of acquiring, operating and maintaining the works and equipment of the district* ....

(Emphasis added.) In this section, the district court found legislative intent that districts may fund water and sewer systems through taxation and the concomitant issuance of general obligation bonds. Similarly, the district court reached the following conclusion from its reading of Wyo. Stat. Ann. § 41–10–127 (LexisNexis 2009), the substance of which is identical to the language of Section 27 set forth above:

> The intent to allow a variety of financing options also is reflected in Wyoming Statute § 41–10–127[1], which limits the amount of indebtedness a board may incur but specifically excludes from that calculation "bonds or other evidences of indebtedness ... for supplying water to the district[.]" *Id.* Accordingly, The District has the power to incur general obligation bonds issued to supply water to The District. Section 127 provides that maximum aggregate amount of indebtedness a district can incur but exempts indebtedness outstanding for supplying water to the district from those calculations.

[¶ 33] Next, the district court concluded that Wyo. Stat. Ann. § 41–10–130 (LexisNexis 2009) "arguably allows a district to incur indebtedness to pay for the acquisition or improvement of **any** project by general obligation bonds *or* revenue bonds" because the "section apparently applies to **all** extensions of credit, including general obligation bonds." (Emphasis in original.) Section 41–10–130 provides in pertinent part as follows:

> Whenever any board shall determine, by resolution, that the interest of said district and the public interest or necessity demand *the acquisition or improvement of any project* ... to carry out the objects or purposes of said district, *requiring the creation of an indebtedness or the issuance of securities herein required to be authorized by the electors of the district,* said board shall order the submission of the proposition of creating such indebtedness or securities to the qualified electors of the district at an election.

(Emphasis added.)

[¶ 34] The district court found additional support for the proposition that revenue bonds are not intended to be the sole method for financing the acquisition or improvement of a water system in the language of Wyo. Stat. Ann. § 41–10–131 (LexisNexis 2009). That statute provides in part as follows:

> The principal of and interest on revenue bonds herein authorized to be issued ... shall be payable solely from the net revenues derived from the operation of the project for the acquisition or improvement of which the bonds are issued ...; *and the principal of and interest on special assessment bonds herein authorized to be issued ... shall be payable solely out of moneys collected on account of the assessments, principal, interest and any penalties, levied for the project for the acquisition or improvement of which the bonds are issued* [.]

(Emphasis added.) The district court concluded that the emphasized language of this section "would be rendered null and void if a district was limited to acquiring or improving a water or other income-producing project out of the net revenues of said project." Finally, the district court cited Wyo. Stat. Ann. § 41–10–134 (LexisNexis 2009), which provides that "[g]eneral obligation bonds, revenue bonds or special assessment bonds herein authorized to be issued shall bear a date or dates, shall mature in a denomination or denominations *at the time or times not exceeding the estimated life of the improvements acquired with the bond proceeds* ...." (Emphasis added.)

[¶ 35] Mountain Cement's disagreement with the district court's conclusions is three-pronged. First, Mountain Cement is adamant that the very specific words used in § 41–10–128 are unambiguous, and those words unambiguously require that bonds issued for the purpose of acquiring or improving a water system "shall be made payable solely out of the net revenues derived from the operation of the system...." In short, such bonds must be revenue bonds.

[¶ 36] Second, while conceding that the title or heading of a statute is not part of the substantive law enacted, Mountain Cement notes that the title or heading may suggest the purpose of the statute. *See* Wyo. Stat. Ann. § 8–1–105(c) (LexisNexis 2009); *Counts v. State,* 2008 WY 156, ¶ 18, 197 P.3d 1280, 1285 (Wyo.2008); and 73 Am.Jur.2d *Statutes* § 108 (2001). In that regard, Mountain Cement finds the legislative history of the headings to this statute instructive. We noted above that, as originally enacted in the 1959 Session Laws, Section 28 was entitled "Revenue Bonds." [9] Mountain Cement considers that heading a clear indication that the bonds described therein were to be revenue bonds. In 1965, the legislature re-enacted Section 28 with the new heading "Water, Sewer System Bonds; Conditions." 1965 Wyo. Sess. Laws, ch. 144, § 2, at 397. In this change, Mountain Cement sees the legislature's intent to identify the specific conditions that must be placed upon bonds issued for water systems; i.e., such bonds must be payable solely out of revenues. Mountain Cement also points out a further re-enactment of the statute in 1996, with the heading changed to "Borrowing money and issuing bonds for purpose of acquiring or improving water or sewer system or other income-producing project." 1996 Wyo. Sess. Laws, ch. 97, § 2, at 327. This change, Mountain Cement contends, reinforced the legislature's intent to limit how bonds can be used to fund water systems.

[¶ 37] Finally, Mountain Cement disagrees with the conclusions the district court reached when reading § 41–10–128 *in pari materia* with other sections of the Water and Sewer District Law. For instance, Mountain

Cement reads § 41–10–115 as authorizing the District to pay for operations, and for acquisition and maintenance of "works and equipment" by tax levy, and to pay interest and principal on general obligation bonds, but not to pay obligations statutorily required to be paid by net revenues. Instead, Mountain Cement points to the District's authority under Wyo. Stat. Ann. § 41–10–113(a)(xxi) (LexisNexis 2009) to increase usage rates and to pledge the additional income to pay any indebtedness of the District. Specifically, Mountain Cement argues that the general provisions of § 41–10–115 do not abrogate the requirements of §§ 41–10–128 and 41–10–131 that improvements to the water system must be funded by the net revenues derived from operation of the system.

[¶ 38] Mountain Cement also takes issue with the district court's interpretation of § 41–10–127 as granting authority to the District to issue general obligation bonds for the purpose of supplying water to the District. Mountain Cement contends that the exemption of certain bonds from the total indebtedness computation is not equivalent to a grant of authority to issue general obligation bonds for any particular purpose, and does not negate the specific language of § 41–10–128. Similarly, according to Mountain Cement, the provisions of §§ 41–10–129 and 41–10–131 dealing with special assessment districts do not amend or abrogate the specific language of § 41–10–128. In fact, § 41–10–131 states that "[a]ll bonds not issued payable solely from such revenues or special assessments (with or without additional security) shall be the general obligations of the district, and the full faith and credit of the district shall be pledged for the payment thereof[,]" thus maintaining the distinction between the two. Finally, Mountain Cement characterizes § 41–10–130 as a statute setting forth the general requirements for any bond issue that requires an election, and § 41–10–134 as a statute setting forth the general requirements for any bond "herein authorized to be issued" in regard to maturity dates, rates of interest, and other procedural requirements. Neither statute, according to Mountain Ce-

9. This section was codified in 1957 as Wyo. Stat. Ann. § 41–479.28 (Michie 1959 Supp.) and then renumbered in 1977 as Wyo. Stat. Ann. § 41–10–128 (Michie 1977).

ment, contains a specific grant of authority to issue general obligation bonds for any particular purpose.

[¶ 39] Before we address the question of whether the bond issue violated § 41–10–128, we feel obliged to discuss some inter-related rules of statutory construction that must be clearly understood and applied in this case: (1) our first duty is to interpret a statute to determine whether it is ambiguous or unambiguous; (2) we have no right or authority to construe an unambiguous statute; (3) in interpreting statutes, we consider all related statutes *in pari materia*.[10] We have set forth these principles in seemingly innumerable opinions. *See, e.g., BP America,* 2005 WY 60, ¶ 15, 112 P.3d at 604; *Fuller v. State,* 2010 WY 55, ¶ 5, 230 P.3d 309, 310 (Wyo. 2010); *Rawlinson v. Greer,* 2003 WY 28, ¶ 14, 64 P.3d 120, 123 (Wyo.2003); *Wyo. Cmty. Coll. Comm'n v. Casper Cmty. Coll. Dist.,* 2001 WY 86, ¶ 16, 31 P.3d 1242, 1249 (Wyo. 2001). In every case, we have defined the word ambiguous as meaning something like "vague or uncertain and subject to varying interpretations." *See, e.g., Fuller,* 2010 WY 55, ¶ 5, 230 P.3d at 310; *Rawlinson,* 2003 WY 28, ¶ 14, 64 P.3d at 123. By identifying the practice of construing statutes *in pari materia* as a rule of construction, we have suggested that the practice does not apply unless we first find a particular statute to be ambiguous. In fact, that appears to be the general rule:

> Sections and acts in pari materia, and all parts thereof, should be construed together and compared with each other. Because the object of the rule is to ascertain and carry into effect the legislative intent, it proceeds upon the supposition that the several statutes were governed by one spirit and policy, and were intended to be consistent and harmonious in their several parts and provisions. Under this rule, each statute or section is construed in the light of, with reference to, or in connection with, other statutes or sections. However, no mere collation of other statutes is decisive in determining what a particular statute means. ***Furthermore, as in the case***

> ***of all other rules of statutory construction, the necessity of applying the rule as to the construction of statutes in pari materia exists only where the terms of the statute to be construed are ambiguous, or its significance doubtful.***

73 Am.Jur.2d *Statutes* § 103 (2001) (emphasis added; footnotes omitted).

[5] [¶ 40] The problem with applying the practice of reading statutes *in pari materia* only in cases where an ambiguity has been identified within the confines of a single statute is that it does not account for the ambiguity created when two related statutes say two different things on the same subject. Some courts have taken care of this problem by broadening the definition of ambiguity to include situations where one statutory section irreconcilably conflicts with another statutory section. *See, e.g., People v. Gardner,* 482 Mich. 41, 753 N.W.2d 78, 85, n. 12 (2008); and *Vill. of Holly v. Holly Twp.,* 267 Mich. App. 461, 705 N.W.2d 532, 539 (2005), *appeal denied,* 474 Mich. 1025, 708 N.W.2d 429 (2006); 73 Am.Jur.2d *Statutes* § 114 (2001). Our point now is to make it clear that statutes should be considered *in pari materia* as part of the process of determining whether they are ambiguous, and not just as part of the process of determining their meaning once they have been found to be ambiguous. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340–41, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) (unambiguous if "statutory scheme is coherent and consistent"). In ˙actuality, such is not inconsistent with our prior practice, even though we have not always been clear on the matter. *See, e.g., Anderson v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 157, ¶ 9, 245 P.3d 263, 266–67 (Wyo. 2010); *Ball v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 128, ¶ 29, 239 P.3d 621, 629 (Wyo.2010); *Bd. of County Comm'rs of County of Campbell v. Rio Tinto Energy Am., Inc.,* 2008 WY 139, ¶ 5, 196 P.3d 791, 793 (Wyo.2008); *BP America,* 2005 WY 60, ¶ 15, 112 P.3d at 604; and *Jones ex rel. Jones v. State, Dep't of Health,* 2001 WY 28,

---

**10.** This Latin phrase means "in the same manner" or "on the same subject." *Black's Law* *Dictionary* 862 (9th ed. 2009).

¶ 11, 18 P.3d 1189, 1194 (Wyo.2001). We take this opportunity to clarify that a statute is ambiguous not only if it is vague or uncertain and subject to varying interpretations, but also if it irreconcilably conflicts with another statute or section of the same statute *in pari materia. Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC,* 986 So.2d 1260, 1265–66 (Fla.2008) ("If a part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others *in pari materia,* the Court will examine the entire act and those *in pari materia* in order to ascertain the overall legislative intent.").

[¶ 41] The second point we wish to make in regard to statutory construction arises out of the fact that the district court appears to have found § 41–10–128 unambiguous in its wording, but then found it ambiguous due to its effect. *See supra* ¶ 29. That runs contrary to the general rule:

It is generally regarded as permissible to consider the consequences of a proposed interpretation of a statute, *where the act is ambiguous in terms and fairly susceptible of two constructions.* Under such circumstances, it is presumed that undesirable consequences were not intended; instead, it is presumed that the statute was intended to have the most beneficial operation that the language permits. A construction of which the statute is fairly susceptible is favored which will avoid all objectionable, mischievous, indefensible, wrongful, evil, and injurious consequences.

On the other hand, *where a statute is so plain and unambiguous that it is not susceptible of more than one construction, courts construing the same should not be concerned with the consequences resulting therefrom.* The undesirable consequences do not justify a departure from the terms of the act as written. In such case, the consequences, if objectionable, can only be avoided by a change of the law itself, to be effected by the legislature,

and not by judicial action in the guise of interpretation.

73 Am.Jur.2d *Statutes* § 171 (2001) (emphasis added; footnotes omitted). We have adhered, and will continue to adhere to that principle, and we look outside the statute to its purposes and effects only if it is ambiguous:

When the language is not clear or is ambiguous, the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent.

*City of Torrington v. Cottier,* 2006 WY 145, ¶ 5, 145 P.3d 1274, 1277 (Wyo.2006); *see also Wyo. Cmty. Coll. Comm'n,* 2001 WY 86, ¶ 18, 31 P.3d at 1249; and *Richards v. Bd. of County Comm'rs of Sweetwater County,* 6 P.3d 1251, 1253 (Wyo.2000). When construing an ambiguous statute, we seek an intent that is reasonable and just, rather than one that is unreasonable or absurd. *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2003 WY 83, ¶ 9, 72 P.3d 799, 802 (Wyo.2003); *Halliburton Co. v. McAdams, Roux & Assocs.,* 773 P.2d 153, 154–55 (Wyo. 1989); 73 Am.Jur.2d *Statutes* § 172 (2001).[11]

[¶ 42] The issue upon which we must focus, re-stated somewhat simplistically, is whether § 41–10–128 provides that revenue bonds are *a way* or *the only way* in which the District may fund its proposed well water project. We conclude that, when read *in pari materia* with the other provisions of the Water and Sewer District Law, the unambiguous intent of § 41–10–128 is to allow, but not to require, the use of revenue bonds for such purpose.

[¶ 43] Section 41–10–113(a)(xii) authorizes districts "[t]o borrow money and incur indebtedness and other obligations and evidence the same by certificates, notes or debentures, and to issue bonds, in accordance

---

11. "However, the absurd results doctrine should be used sparingly because it entails the risk that the judiciary will displace legislative policy on the basis of speculation that the legislature could not have meant what it unmistakably said." 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 45:12, at 105–07 (7th ed. 2007).

with the provisions of this act[.]" In turn, § 41–10–124(a) lists the particular methods available to districts for such borrowing: short-term notes, general obligation bonds and like securities, revenue bonds and like securities, and special assessment bonds and like securities. Section 41–10–124 is followed by separate statutes detailing how each of those borrowing methods can be implemented: § 41–10–125 covers short-term notes, § 41–10–126 covers general obligation bonds, § 41–10–128 covers revenue bonds, and § 41–10–129 covers special assessment bonds. We do not see in § 41–10–126 any limitation upon the use of general obligation bonds to fund a water or sewer or other income-producing system, and we read § 41–10–128, *in pari materia,* as simply authorizing the issuance of revenue bonds for projects that are revenue-producing. Given the sense of the entire Act, it is too restrictive and unreasonable to read the words "provided that" in § 41–10–128 as being a limitation on all bonds issued to fund such a project; rather, the words are meant to allow a district to fund such a project with bonds whose payment is restricted to revenue from the project.

[¶ 44] The logic underlying this view of the Water and Sewer District Act is perhaps too obvious to require discussion, but we will identify it for the sake of emphasis: general obligation bonds may be issued to fund all types of projects, but revenue bonds only make sense if the project being funded is revenue-producing. Stated alternatively, logic does not prohibit the issuance of general obligation bonds to fund a revenue-producing project, but logic does prohibit the issuance of revenue bonds to fund a non-revenue-producing project. Logic therefore supports a reading of § 41–10–128 as describing what a district must do to issue revenue bonds to fund a revenue-producing project, but not a reading of § 41–10–128 as prohibiting the issuance of general obligation bonds for such a purpose. In that regard, Mountain Cement has presented no compelling argument for the proposition that the legislature would have intended to prohibit the use of general obligation bonds for the central function of a district, that being the acquisition or improvement of water and sewer systems. Fi-

nally, we will note that § 41–10–134, which requires bonds to mature at a time no later than the "estimated life of the improvements acquired with the bond proceeds," applies not just to revenue bonds and special assessment bonds, but also to general obligation bonds.

***Whether the District's proposed general obligation bond issue for the purpose of improving and expanding the District's existing water system violates the District's statutory indebtedness limitation?***

[¶ 45] This issue arises out of the wording of § 41–10–127, with the emphasized language shown below being the focal point of the controversy:

The aggregate amount of bonds or other evidences of indebtedness shall not exceed six percent (6%) of the assessed value of the taxable property within the district as shown by the last preceding general assessment; *provided, however, that in determining the amount of indebtedness, there shall not be included within the computation, bonds or other evidences of indebtedness outstanding or authorized to be issued for supplying water to the district,* short-term notes, special assessment securities, or securities payable solely from the net revenues of an income-producing system or other project.

(Emphasis added.)

[¶ 46] Mountain Cement takes the position that the proposed general obligation bond issue should not be excluded from the indebtedness computation under this statute because the underlying project will not "supply water to the district," but will "make improvements to" the District's existing system. Mountain Cement relies heavily in its argument upon the wording of Wyo. Stat. Ann. § 15–7–109 (LexisNexis 2009), which provides an indebtedness limitation for cities and towns:

No debt in excess of the taxes for the current year may be created by any city or town, except local improvements as provided by law, unless the proposition to create the debt is approved by a vote of the people. No city or town may create any

indebtedness exceeding four percent (4%) of the assessed valuation of the taxable property except an additional indebtedness not exceeding four percent (4%) of the assessed valuation of the property may be created to build and construct sewerage systems. *This limitation does not apply to the construction, establishing, extending and maintaining of water works and supplying water for the use of the city or town and its inhabitants.*

(Emphasis added.) Mountain Cement argues that the legislature clearly distinguishes between "constructing, establishing, extending and maintaining" water systems and "supplying water," and that, therefore, use only of the phrase "supplying water" in § 41–10–127 evidences legislative intent not to exempt from the indebtedness limitation for water and sewer districts indebtedness for projects that simply improve or extend an existing system.

[¶ 47] The District counters Mountain Cement's contentions with three arguments. First, the District points out that, in regard to cities and towns, article 16, section 5 of the Wyoming Constitution provides only that "[i]ndebtedness created *for supplying water* to cities or towns is excepted from the limitation herein." (Emphasis added.) Given that wording, the wording of § 15–7–109, "construction, establishing, extending and maintaining of water works and supplying water" can only be interpreted as being the equivalent; in other words, it means "supplying water." Second, the District points out that in *Diefenderfer v. State ex rel. First National Bank of Chicago,* 13 Wyo. 387, 80 P. 667, 669 (1905), this Court cited the above constitutional limitation in a case involving bonds that had been issued for "constructing, purchasing, and regulating a system of waterworks for the town," meaning that the term "supplying water" encompassed the broader concept. Third, the District calls the Court's attention to Wyo. Stat. Ann. § 41–10–149 (LexisNexis 2009), which expressly directs how the Water and Sewer District Law is meant to be construed in relation to the issuance of bonds:

> This act [§§ 41–10–101 through 41–10–151], *without reference to other statutes of the state, except as herein specifically provided,* shall constitute full authority for the authorization and issuance of bonds hereunder. No other act or law with regard to the authorization or issuance of bonds that provides for an election, requires an approval, or in any way impedes or restricts the carrying out of the acts herein authorized to be done shall be construed as applying to any proceedings taken hereunder or acts done pursuant hereto, it being intended that this act shall provide a separate method of accomplishing its objectives, and not an exclusive one, and this act shall not be construed as repealing, amending or changing any such other act or law.

(Emphasis added.)

[¶ 48] In a fairly brief decision letter issued on July 8, 2010, the district court sided with the District in concluding that the District's proposed general obligation bond issue was exempt from the debt limitation found in § 41–10–127. First, the district court concluded that Mountain Cement's reliance upon the phraseology of § 15–7–109 was misplaced, given the legislature's directive in § 41–10–149 that the Water and Sewer District Act be construed "without reference to other statutes of the state[.]" In addition, the district court pointed out that, even if it were to consider § 15–7–109, the distinction supposedly made in that section between "the construction, establishing, extending and maintaining of water works" and "supplying water" is really not all that clear, given the language in Wyo. Stat. Ann. § 15–7–101(a)(ii) (LexisNexis 2009) empowering cities and towns to issue bonds whose purpose is to "[e]stablish, construct, purchase, extend, maintain and regulate a system of water works, for the purpose of supplying water . . . ." The district court's final analysis was as follows:

> The Court agrees with The District as to the plain meaning of Wyoming Statute § 41–10–127 and as to The District's analysis of Wyoming Statute § 15–7–109. Even more so, the Court finds it virtually impossible to interpret the phrase "supplying water to the district" in such [a] way as to exclude "establish, construct, purchase, ex-

tend, maintain and regulate a system of water works," as Mountain Cement would have this Court do. The very purpose of a water district is to supply water to its district and removing its financial ability to establish, construct, purchase, extend, maintain or regulate a system of water works would effectively destroy the district's ability to fulfill its stated purpose. Despite Mountain Cement's concerns, all water and sewer districts are held accountable through elections and public hearings that serve the purpose of regulating the districts' actions and providing checks and balances in relation to the statutory powers bestowed upon the districts. The Court sees no reason to deliberately and awkwardly interpret the phrase "supplying water to the district" so as to prohibit The District from improving, bettering or extending its water supply. Such an approach is repugnant to the rules of statutory construction and, this Court believes, in violation of the Wyoming Legislature's intent.

[¶ 49] Our *de novo* review of this question of law leads us to conclude that the district court should be affirmed. We do not find § 41–10–127 to be ambiguous. By including in the exception both bonds issued for supplying water and bonds issued for income-producing systems or other projects, the legislature clearly intended for the exception to be broad, so as to allow districts to fulfill their statutory purpose. Further, reading the statute *in pari materia* as part of the Water and Sewer District Law, we can see no logical reason for exempting from the debt limitation part, but not all, of the process of obtaining and providing water to a district. The supposed distinction between "supplying water" and "establishing, constructing, purchasing, extending, maintaining and regulating a system of water works" is artificial. One need look no further than the definitional section of the Water and Sewer District Law to reach this conclusion. In Wyo. Stat. Ann. § 41–10–101(a) (LexisNexis 2009), we find the following definitions:

. . . .

(ii) "Water district" shall mean any district organized *to acquire any water pro-*

*ject for the purpose of supplying water* for domestic purposes by any available means, the treatment of such water, and its distribution, *for which purposes the district shall. have power to acquire water rights, treatment facilities and lines for a water system, and appurtenant facilities,* within and without its corporate limits;

. . . .

(x) *"Project" shall mean any structure, facility, undertaking or system which a district is authorized to acquire, improve, equip, maintain or operate* . . . .

(Emphasis added.) We conclude that, within the Water and Sewer District Law, the legislature did not intend to distinguish between the act of creating a system for the purpose of supplying water and the act of supplying water.

### Does a Wyoming board of county commissioners have the power and authority to remove real property from a water and sewer district?

[¶ 50] This issue comes before us in the form of a certified question pursuant to W.R.A.P. 12.09(b). The context in which the issue presents itself is as follows: On January 30, 2009, Mountain Cement filed with the Board a Petition for Exclusion from the South of Laramie Water & Sewer District (the Petition). By stipulation of the parties, the Board certified three questions of law to the district court, the first of which was the question now considered by this Court. Based upon the district court's response, the Board dismissed the Petition for failure to state a claim upon which relief can be granted. Mountain Cement then filed in the district court a petition for review of the dismissal order. The parties stipulated that the matter should be certified to this Court, once again under W.R.A.P. 12.09(b), and once again with the same three questions to be answered.

[¶ 51] While this is not, directly, an appeal from the district court's response to the Board's certification, we will set forth the district court's reasoning because the Board's dismissal order was based directly upon the district court's decision letter and order an-

swering the certified questions. First, the district court stated that the Board retained jurisdiction over the District pursuant to Wyo. Stat. Ann. § 41–10–103(b) (LexisNexis 2009). Next, the district court noted that Wyo. Stat. Ann. § 41–10–120 (LexisNexis 2009) allowed for changes in district boundaries. That statute provides as follows:

(a) The boundary of any district organized under the provisions of this act may be changed *in the manner prescribed in the Special District Elections Act of 1994*, but the change of boundaries of the district shall not impair nor affect its organization, nor shall it affect, impair or discharge any contract, obligation, lien or charge on which it might be liable or chargeable had such change of boundaries not been made.

(b) Property included within or annexed to a district shall be subject to the payment of taxes and charges, as provided in the Special District Elections Act of 1994. *Real property excluded from a district* shall thereafter be subject to the levy of taxes for the payment of its proportionate share of any indebtedness of the district outstanding at the time of such exclusion. Personal property may be excluded from a district on such terms and conditions as may be prescribed by the board of the district involved.

(Emphasis added.)

[¶ 52] Following this statute's guidance, the district court next looked to the Special District Elections Act of 1994, which is specifically therein made applicable to water and sewer districts. Wyo. Stat. Ann. § 22–29–103(a)(x) (LexisNexis 2009). The district court then cited Wyo. Stat. Ann. § 22–29–307 (LexisNexis 2009), which specifically addresses changes to the boundaries of districts, and which reads in full as follows:

Any owner of property that is subject to assessment and payment of tax by a special district, but who is precluded by applicable state or federal law, rule or regulation from using the services provided by the district, may file with the board of county commissioners a petition praying that such lands be excluded from assessment by said district. Petitions shall describe the property which the petitioners desire to have excluded. Such petition must be accompanied by a deposit of money sufficient to pay all costs of the exclusion proceedings. The county commissioners shall cause a notice of filing of such petition to be published, which notice shall state the filing of such petition, the name of petitioners, description of the property mentioned in said petition, and the prayer of said petitioners; and it shall notify all persons interested to appear at the office of said board at the time named in said notice, showing cause in writing, if any they have, why said petition should not be granted. The board at the time and place mentioned in the notice, or at the times to which the hearing of said petition may be adjourned, shall proceed to hear the petition and all objections thereto, presented in writing by any person showing cause why the prayer of the petition should not be granted. The filing [of] such petition shall be deemed and taken as an assent by each and all such petitioners to the exclusion from the district of the property mentioned in the petition or any part thereof. The exclusion shall be allowed if an owner of assessed property is precluded by applicable state or federal law, rule, or regulation from using the services provided by the district. This section shall be applicable only to petitions filed in accordance with the provisions of this section on or before March 31, 1999.

[¶ 53] Based upon these statutes, which it found to be unambiguous, the district court answered the first certified question in the affirmative. Focusing solely upon §§ 41–10–103(b) and 41–10–120, we agree. These statutes clearly authorize boards of county commissioners to remove real property from a water and sewer district, so we answer the first certified question in the affirmative.

*If the answer to the first question is "yes," under what circumstances may a board of county commissioners remove property from a water and sewer district?*

[¶ 54] As noted above, we are not directly reviewing the conclusions of the district court

in its order responding to the questions certified to it by the Board. Nevertheless, because of its impact in regard to the third question, we will note that the district court answered this question by stating simply, "[u]nder those circumstances set forth in Wyo. Stat. [Ann.] § 22–29–307." We disagree. By its own terms, § 22–29–307 does not apply to any petition filed after March 31, 1999. Therefore, it does not apply to Mountain Cement's petition. As a consequence, the conditions or requirements set forth in the statute do not provide the "circumstances" under which a board of county commissioners may at the present time, or at the time Mountain Cement's petition was filed, remove property from a district. Unfortunately, perhaps, this leads to some difficulty because § 41–10–120 limits the authority of boards of county commissioners to change district boundaries to the "manner prescribed in the Special District Elections Act of 1994," and with the lapse or "sunsetting" of § 22–29–307, the Special District Elections Act provides no manner for the changing of district boundaries by exclusion of property.

▪ [¶ 55] We are not free, in the guise of statutory construction, to supply what we believe the legislature may have intended as a "manner prescribed" to replace that which saw its demise on March 31, 1999. *See, e.g., State ex rel. Wyo. Worker's Comp. Div. v. Mahoney*, 798 P.2d 836, 838 (Wyo.1990); *In re TR*, 777 P.2d 1106, 1111 (Wyo.1989); and *State ex rel. Albany County Weed & Pest Dist. v. Bd. of County Comm'rs of Albany County*, 592 P.2d 1154, 1157 (Wyo.1979). Stated another way, courts do not decide what should be said in a statute, we do not supply omissions, and we do not "fix" what appear to be defects; we only interpret statutes and declare what the law is. Language will not be inserted into statutes that the

legislature omitted. *Merrill v. Jansma*, 2004 WY 26, ¶ 29, 86 P.3d 270, 285 (Wyo.2004); *In re Adoption of Voss*, 550 P.2d 481, 484–85 (Wyo.1976); *Barber v. State Highway Comm'n*, 80 Wyo. 340, 350–51, 342 P.2d 723, 725 (1959); *Hamilton v. Territory of Wyo.*, 1 Wyo. 131, 135 (Wyo.Terr.1873). What that means in the present case is that, if the legislature chose to terminate on a particular date the requirements for the filing of, and consideration of, an exclusion petition that are set forth in § 22–29–307, but failed to replace those requirements with any other, it is not the business of the courts to "enact" requirements for petitions filed after March 31, 1999. In short, there presently are no statutory circumstances under which a board of county commissioners may remove property from a water and sewer district. That leaves little for a board of county commissioners to do in response to a petition, inasmuch as a county has only that authority that is granted to it by statute. *See, e.g., Bd. of County Comm'rs for Sublette County v. Exxon Mobil Corp.*, 2002 WY 151, ¶ 22, 55 P.3d 714, 721 (Wyo.2002); *Dunnegan v. Laramie County Comm'rs*, 852 P.2d 1138, 1142 (Wyo. 1993). Consequently, the answer to the second certified question must be that there are no circumstances under which a board of county commissioners may remove property from a water and sewer district, unless the Petition was filed prior to March 31, 1999.[12]

*Does the Petition for Exclusion of Mountain Cement Company from the South of Laramie Water and Sewer District, taking the facts alleged in the Petition as true and the allegations viewed in the light most favorable to Mountain Cement, state a claim upon which relief can be granted?*

▪ [¶ 56] The district court determined that the Board correctly dismissed Mountain

12. Mountain Cement urges us to look to the legislature's specific intent in adopting § 22–29–307. *See Journal of the Senate of the Fifty-fourth Legislature of Wyoming, Special and Budget Session* (February 16, 1998 through March 12, 1998), S.F. No. 0042 "Special district election laws," pp. 215–25. In particular, Mountain Cement points out what it believes to have been the subjective intent of the sponsor of the amendment that added the March 31, 1999, limit on the

applicability of the section. We cannot, for two reasons, consider this "evidence" of legislative intent. First, the statute is not ambiguous, so we are not at liberty to resort to legislative history. *Mathewson v. City of Cheyenne*, 2003 WY 10, ¶ 6, 61 P.3d 1229, 1232 (Wyo.2003). Second, even if the inquiry were appropriate, the subjective intent of a particular legislator is not appropriate for consideration. *Independent Producers Mktg. Corp. v. Cobb*, 721 P.2d 1106, 1108 (Wyo.1986).

Cement's petition for failure to state a claim upon which relief can be granted. In doing so, it appears that the district court treated the last sentence of § 22–29–307 as creating a period of limitations for the filing of *any* petition to have property excluded from a district. In effect, the district court treated March 31, 1999, as a "drop dead" date. While we agree with the district court that Mountain Cement's petition does not state a claim upon which relief can be granted, we disagree with the district court's rationale in reaching that conclusion. The last sentence of § 22–29–307 does not prohibit the filing of petitions after March 31, 1999; rather, it makes the requirements of the section applicable only to those petitions filed on or before March 31, 1999. The problem is that the legislature has provided boards of county commissioners with no method or manner with which to deal with petitions filed after that date, leaving boards of county commissioners with no ability to act. That is why Mountain Cement's petition was properly dismissed.

## CONCLUSION

[¶ 57] We conclude as follows: First, in S–10–0199, Mountain Cement is barred by the language of § 41–10–107(g) from now contesting in court the inclusion of part of its property in the District. Second, the District's proposed general obligation bond issue did not violate the provisions of § 41–10–128. Third, the District's proposed general obligation bond issue did not violate the provisions of § 41–10–127. Therefore, we affirm the district court.

[¶ 58] In S–10–0238, we answer the certified questions as follows and affirm the decision of the Board not to exclude Mountain Cement's property from the district:

1. Does a Wyoming board of county commissioners have the power and authority to remove real property from a water and sewer district?

Yes.

2. If the answer to the first question is "yes," under what circumstances may a board of county commissioners remove property from a water and sewer district?

The legislature has not defined the circumstances under which a board of county commissioners may remove property from a water and sewer district, leaving such boards unable to act upon a petition for exclusion.

3. Does the Petition for Exclusion of Mountain Cement Company from the South of Laramie Water and Sewer District, taking the facts alleged in the Petition as true and the allegations viewed in the light most favorable to Mountain Cement, state a claim upon which relief can be granted?

No.