**Reginald McGEE, on behalf of himself and all others similarly situated, Plaintiff–Appellant,**

v.

**KERR–HICKMAN CHRYSLER PLYMOUTH, INC. and General Electric Capital Corporation, Defendants–Appellees.**

No. 95–3187.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1996.

Decided Aug. 19, 1996.

---

Daniel A. Edelman (argued), Cathleen M. Combs, James O. Latturner, Edelman & Combs, Chicago, IL, for plaintiff-appellant.

Robert L. Kiesler, Bryan W. Luce, Dale L. Schlafer, Peter R. Mennella, Kiesler & Berman, Chicago, IL, David B. Johnson (argued), Theodore R. Scarborough, Jr., Sidley & Austin, Chicago, IL, George A. Platz, Lovell White Durrant, Chicago, IL, for defendant-appellee.

Before BAUER, ESCHBACH, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Reginald McGee sued Kerr–Hickman Chrysler Plymouth, Inc. ("Kerr–Hickman") and General Electric Capital Corporation ("GECC"), alleging a violation of the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, as well as various state law infractions, all in connection with his purchase of a used car from Kerr–Hickman.[1] Some of the claims, including the TILA claim, were brought as a class action. The TILA violation alleged was the systematic designation of a particular "finance charge" as part of the "amount financed," rather than as a "finance charge," within the TILA disclosures in Kerr–Hickman's sales contracts. The defendants filed motions to dismiss. The district court granted the motions with respect to the TILA claim on the merits and dismissed the supplemental state law claims.[2] We affirm.

## I.

On July 27, 1994, McGee purchased a used 1988 Pontiac Trans Am from Kerr–Hickman. This case concerns the contents of the retail

---

1. McGee initially filed a claim under the Magnuson–Moss Consumer Warranty Act as well, 15 U.S.C. § 2301, *et seq.*, but he conceded in district court that he could not meet the jurisdictional minimum for such a claim. He does not appeal the district court's dismissal of that claim.

2. McGee has subsequently pursued his state law claims separately in state court.

installment contract ("the sales contract" or "the contract") by which McGee's purchase was accomplished. The contract notes that McGee agreed to pay $9500 for the car and that he made an $800 down payment, leaving $8700 as the "credit sale balance." In a section headed "Amounts Paid to Other for You," the sales contract records $1371.50 paid to insurance companies, $824.20 paid to public officials (for license, title, and taxes), a $40 documentation fee, and a $750 service contract. In the TILA disclosure box in the upper left corner of the sales contract, the contract lists the "Amount Financed" as $11,-685.70,[3] the "Finance Charge" as $3260.42, and the "Annual Percentage Rate" as 16.75%. McGee was scheduled to make 36 monthly payments of $415.17, for a total of $14,946.12. The sales contract also notes that McGee agreed to purchase credit life insurance for $224.19 and credit disability insurance for $747.31. The sales contract itself does not explain the source of the other $400 listed as paid to insurance companies.

This $400 is accounted for in a separate document, titled "GAP Loan Agreement Addendum" ("GAP Agreement" or "GAP"), which was also executed by McGee and Kerr–Hickman on July 27, 1994. McGee is listed as the Debtor, with Kerr–Hickman listed as the Lender, and GECC listed as the Lending Institution. The GAP Agreement states as follows:

Although the Debtor is not required to do so, the Debtor and the Lender hereby agree to amend the early termination provisions of the Loan Agreement for the above referenced vehicle dated the date hereof.

Under the terms of such Loan Agreement, as amended by this Addendum, if such financed vehicle is stolen and unrecovered or deemed a total loss by the Debtor's insurance company (providing the vehicle insurance which the Debtor is required to maintain at all times under the terms of such Loan Agreement), the Debtor's maximum legal liability to the Lender under such Loan Agreement shall be the actual cash value of the vehicle as determined by the Debtor's insurance company plus any delinquent payments and all past due charges at the time of such theft or loss. (Actual cash value equals the insurance company settlement plus your policy deductible.)

McGee agreed to pay $400 for participation in the GAP program. Under the basic sales contract, McGee's balance would become immediately payable if the Pontiac were destroyed or stolen. If there was a difference between the amount still owed on the car and the cash value of the car determined by McGee's automobile insurance company, i.e., a "gap," McGee would be obligated under the contract to make up the difference out of his own pocket.[4] By purchasing GAP the debtor is able to avoid this risk (though he would still be responsible for paying any past due charges on the loan and any deductible under his automobile insurance policy). The purchase of GAP is optional, however, and does not affect other terms of the sales contract.

The $400 paid for GAP was included on the sales contract as part of the amount paid to insurance companies and within the "Amount Financed" dollar amount listed within the TILA disclosure section. Thus it was not treated as a "Finance Charge" under the sales contract. The sales contract was subsequently assigned by Kerr–Hickman to GECC.[5] The GAP program is administered

---

3. $9500 (for the car) + $2985.70 (total of the listed charges) - $800 (down payment) = $11,-685.70.

4. McGee proposes a number of reasons why such a shortfall will likely occur: 1) upon prepayment or acceleration, the finance charges will be calculated according to the "Rule of 78's," which allocates a disproportionate amount of the finance charge to the earlier months of the contract; 2) the initial loan may have included (as McGee's did) charges for taxes, fees, extended warranties, etc., which increase the debt but not the value of the car, and which would not be

covered by insurance if the car were destroyed or stolen; and 3) the buyer may have paid too much for the car initially.

5. The parties dispute whether the GAP Addendum was also assigned to GECC. McGee's complaint did not specifically state that the GAP document was also assigned, but he now maintains that the entire contract "as amended" was assigned to GECC. Because of the manner in which we decide this case, we need not reach the issue of whether McGee's complaint implicitly alleged that the GAP Agreement was assigned to GECC.

by GECC, and the GAP Addendum specifically instructs the debtor to direct correspondence regarding GAP to GECC's office in Middletown, Rhode Island.

## II.

■ We review a district court's grant of a 12(b)(6) motion to dismiss *de novo*, accepting all well-pled allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. FED. R.CIV.P. 12(b)(6); *Travel All Over the World, Inc. v. The Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir.1996). In this case the parties agree on the essential underlying facts, and the case boils down to one fundamental question: Is the money paid for GAP a "finance charge" under TILA?[6]

The stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). TILA defines "finance charge" as follows:

Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor *as an incident to the extension of credit.* The finance charge does

not include charges of a type payable in a comparable cash transaction.

15 U.S.C. § 1605(a) (emphasis added).[7] Under the regulations implementing TILA, generally termed "Regulation Z," 12 C.F.R. § 226.1, *et seq.*, the term "finance charge" includes "all charges, payable directly or indirectly by the customer, and imposed directly or indirectly by the creditor *as an incident to or as a condition of the extension of credit....*" 12 C.F.R. § 226.4(a) (emphasis added). While both section 1605(a) and Regulation Z provide a number of examples of charges that are included and excluded as "finance charges," neither specifically addresses a charge for debt cancellation agreements like GAP.

■ McGee initially submitted a proposed official staff commentary by the Federal Reserve Board that explicitly addressed the treatment of GAP charges under TILA. This commentary would have determined the treatment of GAP as a "finance charge" according to whether state insurance law regulated it as insurance. In states where debt cancellation agreements like GAP were considered to be a form of insurance, the charge for GAP would not be a "finance charge"; but in states where such agreements were not considered to be insurance under state law, the charge would have to be disclosed as a "finance charge" under TILA. *See* 60 Fed. Reg. 62,764, 62,767 (1995) (proposed Dec. 1, 1995). The parties agree that Illinois does not regulate GAP as insurance. Official staff opinions of the Federal Reserve Board construing TILA and Regulation Z are binding unless they are "demonstrably irrational."

---

**6.** Just prior to oral argument, we were informed of a proposed settlement between McGee, individually and as class representative, and Kerr-Hickman. GECC asserted that if the settlement were to occur as proposed, McGee's claims against GECC would be moot, since McGee would have received all the relief that he was entitled to under TILA. It is our understanding that this settlement has not yet been finalized or approved by the district court. Furthermore, as proposed, the settlement does not provide all the relief that McGee could obtain under TILA, since the settlement does not provide for statutory damages. *See* 15 U.S.C. § 1640(a)(2).

**7.** Section 1605 provides the following specific examples of charges that should be treated as "finance charges": 1) interest, time price differ-

ential, and any amount payable under a point, discount, or other system of additional charges, 2) a service or carrying charge, 3) a loan fee, finder's fee, or similar charge, 4) a fee for an investigation or credit report, 5) a premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss. 15 U.S.C. § 1605(a)(1)-(5). Congress has recently amended this section to note that borrower-paid mortgage broker fees are also considered "finance charges" under TILA. 15 U.S.C. § 1605(a)(6). McGee does not claim that GAP fits within this list or any of the other specific provisions of section 1605(a). Yet it is clear from the language of section 1605(a) that the examples provided do not constitute an exhaustive list.

*Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). Hence if the commentary were officially adopted, McGee would almost certainly prevail. On March 28, 1996, however, after receiving various comments on the proposed rule, the Federal Reserve Board withdrew the proposed commentary. The Board noted that most of the comments were opposed to the proposed rule and that the comments expressed concern about the lack of state-to-state TILA uniformity created by a rule that depended upon state insurance law. 61 Fed. Reg. 14, 952 (1996) (released Mar. 28, 1996). Thus we are back to looking at the statute itself and the currently existing regulations for general guidance.

Regulation Z adds the concept of being mandatory ("as an incident to or as a condition of the extension of credit") to the statutory focus of being "incident to" the extension of credit in the finance charge determination. It is clear from the language of the GAP Agreement produced by McGee that the purchase of GAP was not required by Kerr–Hickman: "Although the Debtor is not required to do so. . . ." McGee could have gotten the car loan and purchased the car without agreeing to buy GAP; and his complaint does not allege otherwise. The charge was not "a condition of" the extension of credit in the broad sense.

█ McGee argues, however, that the concept of being mandatory must not be read too expansively. He maintains that the issue is not whether *no* loan would have been made by the lender unless the borrower agreed to pay a particular charge. Rather, the issue is whether the type of credit arrangement that was ultimately selected required payment of a certain charge, which would then be considered a "finance charge." For example, if a lender offered a borrower either a 10% interest rate on a particular loan or an 8% rate on the same loan, provided the borrower paid an initial $500 "special fee," the $500 fee would be considered a "finance charge," even though the lender did not actually insist that it be paid—the borrower could have chosen to go with the higher interest rate.[8] The

inquiry is whether the charge was required in order to obtain the particular credit terms that were selected. This argument is both logical and persuasive. A fee that a consumer must pay to get a particular credit term is a "finance charge" under TILA, even if the desired credit term is optional. Alone, however, this proposition does not decide the case before us.

Certainly McGee was required to pay $400 in order to purchase GAP, but the question remains whether GAP affected the *credit* relationship between McGee and Kerr–Hickman. In other words, was the GAP charge "incident to the extension of credit"? We find that the GAP charge was not incident to the extension of credit. The GAP Agreement simply did not affect the credit terms of the deal between McGee and Kerr–Hickman. The provisions of GAP deal with the potential consequences of a shortfall between McGee's auto insurance coverage and the remainder due on his loan from Kerr–Hickman, in the event that McGee's car was stolen or destroyed. It is essentially a special insurance policy designed to protect against this risk. It does not affect the rate of interest on McGee's loan, the number of payments required on the loan, or the time period over which the loan must be repaid. These terms would have been the same even if the GAP option was declined. We see no reason why GAP could not have been purchased at a later time by McGee (e.g., one year after the loan was issued) without changing any of the credit terms of the sales contract. In addition, the GAP protection could potentially be offered by a separate insurance company without ever affecting the terms of McGee's car loan from Kerr–Hickman. Both of these possibilities suggest that the GAP option was not purchased "incident to the extension of credit." While McGee repeatedly asserts in his brief that it affected the credit terms of his deal with Kerr–Hickman, he does not explain how GAP affected the nature of his *credit* relationship—i.e., the borrower-lender relationship—with Kerr–Hickman. Though the GAP purchase certainly increased the total amount that McGee

---

**8.** Such an arrangement is often called a "consumer buydown," and the parties do not dispute that the fee charged for such a buydown is indeed a "finance charge" under TILA.

had to pay, many other optional charges (a sunroof, for example) also increase the amount that a borrower must ultimately pay without thereby becoming "finance charges."

McGee argues that the determinative question should be whether the charge could have been imposed within a comparable cash transaction. The statute itself notes that "[t]he finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). Thus the comparison to cash transactions certainly can aid in the determination of whether a particular optional term affects the credit relationship between the parties. The statute does not imply, however, that any charge that would not occur in a cash transaction but could occur in a credit transaction is automatically a "finance charge." It works the other way. In this case we find that even though no one would purchase GAP if he were paying for a car with cash, this does not make GAP a "finance charge" under TILA. GAP affects the relationship between the parties in the event that total loss insurance coverage is inadequate to meet the borrower's remaining loan debt, not the credit terms of the actual loan between the parties. Therefore, the GAP fee was properly included within the "Amount Financed" disclosure in the sales contract and excluded from the "Finance Charge" disclosure.[9] TILA's purpose of assuring consumers an opportunity for meaningful comparison of different available credit terms is not undermined unless the argued-for disclosure actually involves credit terms.[10]

■■■ McGee also challenges the district court's denial of his motion to amend his complaint under Rule 15(a). McGee's motion for leave to amend was filed long after the responsive pleadings of Kerr–Hickman and GECC. Thus McGee needed leave of the district court or written consent by the adverse parties (which was not given) in order to amend his pleadings. FED.R.CIV.P. 15(a). Rule 15(a) notes that "leave shall be freely given when justice so requires." Id. As we have previously recognized, however, such leave can be legitimately denied where there has been undue delay, dilatory motive on the part of the movant, repeated failure to cure previous deficiencies, and where amendment would be futile. *Figgie Int'l, Inc. v. Miller,* 966 F.2d 1178, 1180–81 (7th Cir.1992); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.* 935 F.2d 815, 819 (7th Cir.1991) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). We review a district court's denial of a motion for leave to amend the pleadings for an abuse of discretion. *Id.*

The district court denied McGee leave to amend his complaint, citing a number of reasons for this denial in relation to the different amendments proposed by McGee. McGee apparently challenges only one of these findings on appeal, namely the finding that the amended complaint added a new allegation that GAP coverage was "imposed" by Kerr–Hickman, despite the optional language in the GAP Agreement. The court found that this allegation went against the language of the original complaint and the GAP Agreement itself and that, at any rate, there was no reason why the allegation could not have been pled earlier. The statement that the court objected to reads as follows: "Kerr–Hickman insists on purchase of the

**9.** Our resolution of this question renders moot the question of GECC's TILA liability as assignee of the sales contract. If Kerr–Hickman as lender has no TILA liability here, GECC is off the hook as well.

**10.** After oral argument in this case, McGee filed a motion requesting leave to cite additional authority, namely new proposed regulations from the Federal Reserve Board dealing specifically with GAP and other debt cancellation agreements. We granted McGee's motion. While the proposed regulations have not yet been officially adopted (and may never be), we note that the proposed regulations are consistent with our decision in this case. The regulations would amend 12 C.F.R. § 226.4(d) to provide that fees for debt cancellation agreements like GAP may be excluded from the finance charge if 1) the coverage is not required by the creditor and this fact is disclosed in writing; 2) the fee for the coverage is disclosed; and 3) the consumer signs a written request for the coverage after receiving the required disclosures. 61 Fed.Reg. 26,126, 26,132 (1996) (to be codified at 12 C.F.R. pt. 226) (proposed May 15, 1996). The GAP Agreement at issue in this case unquestionably meets these requirements. Thus the cost of GAP for McGee would be properly excluded from the "finance charge" disclosure even under the proposed rule.

GAP provision as a condition of obtaining credit under which the consumer is relieved from liability for a deficiency if the car is stolen or totalled." The district court read this sentence as alleging that the purchase of GAP was mandatory at Kerr–Hickman. McGee contends that the sentence simply means that a borrower has to pay for GAP if he wants protection against an insurance shortfall if the car is stolen or totalled. (Of course McGee threw in the legal conclusion that GAP affected the credit terms of the deal.) We find the sentence ambiguous, but its "true" meaning does not matter. Either it changed the nature of McGee's allegations and was properly denied as untimely or it simply restated the unremarkable proposition that the borrower had to pay for GAP, in which case McGee was not prejudiced by the denial of leave to amend. In fact, McGee has not provided any argument regarding how he was prejudiced by the court's denial of the motion. Hence we cannot say that the district court abused its discretion in denying McGee leave to amend.

For the foregoing reasons, we AFFIRM the decision of the district court.