2011 WY 163

Jeffrey C. VOGEL, Administrator of the Wyoming Uniform Consumer Credit Code, Appellant (Respondent),

v.

ONYX ACCEPTANCE CORPORATION, Appellee (Petitioner).

No. S–11–0061.

Supreme Court of Wyoming.

Dec. 19, 2011.

Representing Appellant: Gregory A. Phillips, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Ryan Schelhaas, Senior Assistant Attorney General. Argument by Mr. Schelhaas.

Representing Appellee: Gregory C. Dyekman, Dray, Dyekman, Reed & Healey, P.C., Cheyenne, Wyoming; Michael H. Gottschlich, Barnes, & Thornburg, LLP, Indianapolis, Indiana. Argument by Mr. Dyekman.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] The Wyoming Division of Banking (Division) performed a Wyoming Uniform Consumer Credit Code (WUCCC or Code) compliance examination of Onyx Acceptance Corporation (Onyx) and determined it was improperly charging its Wyoming customers fees for making payments by telephone or internet. The Division ordered Onyx to stop charging the fees and refund the fees collected. Onyx appealed the order and the Office of Administrative Hearings (OAH) scheduled a contested case hearing. Onyx and the Division each submitted motions for summary judgment. The OAH issued a recommended decision granting the Division's motion. Consistent with the recommended decision, Jeffrey C. Vogel, the Administrator of the WUCCC (Administrator), issued an order finding that Onyx violated the Code when it charged the fees.

[¶ 2] Onyx filed a petition for review in the district court. After briefing and a hearing, the district court issued a decision letter in which it concluded the fees were not covered by the WUCCC and, therefore, Onyx did not violate the Code by charging them to customers who opted to pay by phone or internet. The district court reversed the OAH decision and remanded the case for entry of summary judgment for Onyx. The Administrator appealed to this Court. We hold that Onyx did not violate the WUCCC

and summary judgment in its favor is appropriate.

## ISSUES

[¶ 3] The Administrator contends Onyx violated the WUCCC by charging customers a fee, that was not disclosed when credit was extended, for making payments by telephone or internet; therefore, the OAH properly entered summary judgment for the Division. Onyx maintains the district court correctly concluded the WUCCC does not prohibit it from charging a fee for optional payment methods it offers to its customers after credit had been extended.

## FACTS

[¶ 4] Prior to submitting their summary judgment briefs to the OAH, the parties stipulated to certain facts, which we rephrase as follows. Onyx was subject to the regulatory jurisdiction of the WUCCC, Wyo. Stat. Ann. §§ 40–14–101 through 702 (Lexis-Nexis 2011), and the Administrator of the Code with respect to consumer credit sales contracts that it purchased from Wyoming automobile dealers. The contracts Onyx purchased were originally executed by automobile dealers and their customers who purchased automobiles on credit. When Onyx purchased the contracts, the dealers assigned them to Onyx and the customers then made the payments on their contracts directly to Onyx.

[¶ 5] Onyx offered customers the option to make payments on their contracts by phone or internet. For customers choosing to make payments in one of those ways, Onyx charged a fee of $9.50 per phone payment and $5.00 per internet payment. The fees were not mentioned in the credit sales contracts nor were they otherwise disclosed to customers at the time the dealer extended credit. Customers who chose to pay Onyx by phone or internet incurred the fees after credit had been extended and after the automobile dealer had assigned the contract to Onyx. The customers had the option not to pay by phone or internet and not to incur the fee by making their payments by regular mail or another expedited method such as Federal Express or Western Union.

[¶ 6] On May 2, 2005, the Division began an examination to determine whether Onyx was in compliance with the WUCCC and the Administrator's rules and regulations. The Division reviewed a random sample of consumer credit contracts for all of Onyx's consumer credit programs then available. It concluded Onyx had violated the Code by improperly charging fees for payment by phone or internet on some of the consumer credit sales contracts it had purchased. The Division issued a report containing its findings. Onyx subsequently eliminated the internet payment fee but continued to offer customers the option of paying by internet.

[¶ 7] In August of 2006, the Division sent out a notice of intent to issue an order requiring Onyx to cease and desist from charging the payment fees to its customers. In September of 2006, Onyx appealed from the notice of intent. The OAH issued a briefing schedule and set the matter for argument. The Division filed its motion for summary judgment and supporting brief, arguing that the fees Onyx charged for payment by phone and internet had not been contracted for or disclosed to its customers as required by the WUCCC; therefore, they were in violation of the Code. Onyx responded and filed a cross motion for summary judgment, contending the fees did not violate the WUCCC. Onyx attached to its motion the affidavit of its corporate operations manager stating that Onyx's policy was to assure that customers who opted to pay by phone or internet were fully aware of the amount of the applicable fee before the payment transaction was initiated; if a customer did not want to pay the fee, it was company policy not to go forward with the payment transaction.

[¶ 8] After a hearing, the OAH concluded the fees violated the WUCCC and issued a recommended order granting summary judgment for the Division. The Administrator issued an order consistent with the OAH's recommendation. Onyx sought review in the district court which, after considering the parties' positions, concluded the fees were not covered by the WUCCC because they were voluntarily incurred by customers well after credit had been extended. The district

court entered an order reversing the OAH and the Administrator appealed to this Court. We uphold the reversal of the Administrator's order.

## STANDARD OF REVIEW

[¶ 9] We review an appeal from a district court's review of an administrative agency's decision as if it had come directly from the administrative agency. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008). Our review of an administrative agency's action is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011), which provides that the reviewing court shall:

> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
>> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>>
>> (B) Contrary to constitutional right, power, privilege or immunity;
>>
>> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>>
>> (D) Without observance of procedure required by law; or
>>
>> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 10] The OAH resolved this dispute by granting summary judgment in favor of the Division. Rule 56 of the Wyoming Rules of Civil Procedure governing summary judgments applies to administrative cases. *Rollins v. Wyo. Tribune–Eagle*, 2007 WY 28, ¶ 6, 152 P.3d 367, 369 (Wyo.2007). W.R.C.P. 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law.

We review summary judgment rulings *de novo*, using the same materials and following the same standards as the OAH. The parties have stipulated to the facts in this case; therefore, we review *de novo* the OAH's conclusions of law.

## DISCUSSION

[¶ 11] We begin with an overview of the WUCCC, a legislative enactment that has not received extensive consideration by this Court. The Code was the result of an effort on both the federal and state level to promote the informed and fair use of credit by requiring meaningful disclosure of credit terms so that consumers would have an understanding of the cost of credit. In 1968, Congress enacted the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 et seq. Title I of that Act contains the Federal Truth in Lending Act (TILA) the stated purpose of which is to promote the informed use of credit.

[¶ 12] That same year, the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Consumer Credit Code (UCCC) with the intent of replacing existing consumer credit laws with "a single new comprehensive law providing a modern, theoretically and pragmatically consistent structure of legal regulation designed to provide an adequate volume of credit at reasonable cost under conditions fair to both consumers and creditors." Uniform Laws Annotated, Vol. 7 Part III 88 (2002). In 1971, Wyoming became one of several states to enact the 1968 version of the UCCC. *Id.* at 89.

[¶ 13] The UCCC as adopted in Wyoming contains seven articles. Article 2 applies to consumer credit sales.[1] Section 40–14–202. The term "consumer credit sale" is defined as "a sale of goods, services, or an interest in land in which:

---

1. Article 1 contains general provisions and definitions. Article 3 pertains to loans. Article 4 addresses insurance in relation to consumer credit sales and consumer loans. Article 5 sets out the remedies and penalties available under the WUCCC. Article 6 provides for the administration of the WUCCC. Article 7 sets forth the effective date and addresses the Code's application to transactions entered into before the effective date.

(i) Credit is granted by a person who regularly engages as a seller in credit transactions of the same kind;

(ii) The buyer is a person other than an organization;

(iii) The goods, services or interest in land are purchased primarily for a personal, family or household purpose;

(iv) Either the debt is payable in installments or a credit service charge is made; and

(v) With respect to a sale of goods or services, the amount financed does not exceed fifty thousand dollars ($50,-000.00) or the debt is secured by a dwelling, as defined in W.S. 40–14–640(a)(iv), located in Wyoming."

Section 40–14–204(a). Pursuant to this provision, transactions such as occurred here between automobile dealers and their customers are consumer credit sales, i.e. the dealers regularly engage as sellers in granting credit to customers who purchase automobiles for personal or family use with the debts payable in installments or imposition of a credit service charge.

[¶ 14] Section 40–14–207 provides that the term "seller" as used in the WUCCC includes "an assignee of the seller's right to payment;" however, "use of the term does not in itself impose on an assignee any obligation of the seller with respect to events occurring before the assignment." There is no question that Onyx, as the assignee of the dealers' rights to payment under the consumer credit sales contracts, is a seller within the meaning of the WUCCC; however, use of the term does not impose on Onyx any of the automobile dealers' obligations with respect to events occurring before the assignment.

[¶ 15] Section 40–14–212(a) provides that a seller involved in a consumer credit sale may contract for and receive a "credit service charge" as provided in subsection (b). Subsection (b) provides generally that the credit service charge may not exceed either 21% or 36% per year depending upon the amount financed. The term "credit service charge" is defined in § 40–14–209(a) in relevant part as the sum of:

(i) All charges payable directly or indirectly by the buyer and imposed directly or indirectly by the seller as an incident to the extension of credit, including any of the following types of charges which are applicable: time price differential, service, carrying or other charge however denominated, premium or other charge for any guarantee or insurance protecting the seller against the buyer's default or other credit loss[.]

Pursuant to § 40–14–209(b), the term "credit service charge" does not include:

(i) Charges as result of default;

(ii) Additional charges pursuant to W.S. 40–14–213;

(iii) Delinquency charges specified by W.S. 40–14–214;

(iv) Deferral charges pursuant to W.S. 40–14–215;

(v) A discount not in excess of five percent (5%) offered by a seller for purposes of inducing payment by cash, check or other means not involving the use of a seller or lender credit card, if the discount is offered to all prospective buyers and its availability is disclosed clearly and conspicuously in accordance with regulations of the administrator; or

(vi) Reasonable credit application fees whether or not credit is extended.

[¶ 16] Section 40–14–213(a) provides that in addition to the credit service charge, a seller may contract for and receive the following charges in connection with a consumer credit sale:

(i) Official fees and taxes;

(ii) Charges for insurance as described in subsection (b) of this section; and

(iii) Charges for other benefits, including insurance, conferred on the buyer, if the benefits are of value to him and if the charges are reasonable in relation to the benefits, are of a type which is not for credit, and are excluded as permissible additional charges from the credit service charge by rules adopted by the administrator.

[¶ 17] In addition to the credit service charge and the additional charges enumerated in the foregoing paragraphs, the WUCCC

provides that parties to a consumer credit sale may contract for delinquency, deferral and limited default charges:

### § 40-14-214. Delinquency charges.

(a) With respect to a consumer credit sale ..., the parties may contract for a delinquency charge on any installment not paid in full within ten (10) days after its scheduled due date in an amount not exceeding the greater of:

(i) Five percent (5%) of the unpaid amount of the installment; or

(ii) Ten dollars ($10.00).

. . . .

### § 40-4-215. Deferral charges.

(a) With respect to a consumer credit sale ..., the parties before or after default may agree in writing to a deferral of all or part of one (1) or more unpaid installments, and the seller may make and collect a charge which the buyer expressly agrees to pay as consideration for the deferral. A deferral charge may be collected at the time it is assessed or at any time thereafter.

(b) The seller, in addition to the deferral charge, may make appropriate additional charges (W.S.40-14-213), and the amount of these charges which is not paid in cash may be added to the amount deferred for the purpose of calculating the deferral charge.

. . . .

### § 40-14-248. Limitation on default charges.

Except for reasonable expenses incurred in realizing on a security interest, the agreement with respect to a consumer credit sale may not provide for any charges as a result of default by the buyer other than those authorized by this act. A provision in violation of this section is unenforceable.

### § 40-14-259. Limitation on default charges in consumer related sales.

(a) The agreement with respect to a consumer related sale may provide for only the following charges as a result of the buyer's default:

(i) Reasonable attorney's fees and reasonable expenses incurred in realizing on a security interest;

(ii) Deferral charges not in excess of eighteen percent (18%) per year of the amount deferred for the period of deferral; and

(iii) Other charges that could have been made had the sale been a consumer credit sale.

 [¶ 18] With this overview in mind, we turn to the issue before us. In granting summary judgment for the Administrator, the OAH concluded that the WUCCC is an "authorizing statute," meaning that it enumerates all fees a seller may charge in connection with a consumer credit sale. Under this interpretation, a seller may charge only a credit service charge and contracted for additional, delinquency, deferral, and limited default charges as those terms are defined in the Code. Because the fees Onyx charged customers for payment by phone or internet were not contracted for and disclosed to the customers as a credit service charge in the consumer sales contracts and do not fall within the definition of additional, delinquency, deferral or default charges authorized by the Code, the OAH concluded Onyx violated the statute in charging the fees to its customers.

[¶ 19] Onyx asserts the legislature did not intend to prohibit all charges not mentioned; rather, it intended to regulate only those charges mentioned. Onyx further contends the fees for payment by phone or internet were not credit service charges covered by the WUCCC because they were not imposed as part of the extension of credit to customers; rather, some customers voluntarily chose to incur the fees when they were disclosed as part of the optional payment methods after the automobile dealer had already extended credit to the customer. Onyx further asserts that as the assignee of the credit sales contracts it had no obligation to disclose credit service charges incident to the dealer-purchaser contracts. The Administrator contends the OAH correctly concluded that Onyx violated the WUCCC by offering the phone and internet payment methods and charging a fee to customers who opted to

make payments in one of those ways because the fees were not disclosed as credit service charges in the consumer sales contract and do not fall within the definition of other charges authorized by the Code.

[¶ 20] Neither party asserts that the fees for payment by phone or internet were contracted for additional charges (§ 40–14–213), delinquency charges (§ 40–14–214), deferral charges (§ 40–14–215) or default charges (§ 40–14–248). The dispute centers on whether the fees are credit service charges within the meaning of § 40–14–209(a). If so, we are asked to decide whether they are prohibited by the WUCCC because they were not mentioned in the consumer credit sales contract or otherwise disclosed to the customer at the time credit was extended. If the fees are not credit service charges, we must decide whether they are prohibited by the Code because they do not fall within the definition of charges authorized by the statute.

▆▆▆▆ [¶ 21] When interpreting statutory language:

> [T]he paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations.

*Office of State Lands and Invs. v. Mule Shoe Ranch, Inc.,* 2011 WY 68, ¶ 13, 252 P.3d 951, 954–55 (Wyo.2011), quoting *Dorr v. Smith, Keller & Associates,* 2010 WY 120, ¶ 11, 238 P.3d 549, 552 (Wyo.2010). As part of the process of determining whether particular statutory language is ambiguous, we consider all parts of the statute in pari materia. *Mountain Cement Co. v. South of Laramie Water & Sewer Dist.,* 2011 WY 81, ¶ 40, 255 P.3d 881, 896 (Wyo.2011). In ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and con-

strued in harmony. *Id.,* ¶ 13, 255 P.3d at 885. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *Office of State Lands,* ¶ 13, 252 P.3d at 955.

[¶ 22] Onyx asserts the fees for payment by internet or phone are not credit service charges because they were not "incident to the extension of credit" within the meaning of § 40–14–209(a)(i). Rather, the credit had been extended to customers before Onyx ever became involved. Onyx maintains that its subsequent decision to offer customers the alternative payment options for a fee had nothing to do with the extension of credit to the automobile buyers. The administrator interprets the phrase "incident to the extension of credit" more broadly as including any fee charged in connection with the extension of credit and not excluded from the term "credit service charge" by the WUCCC or rule.

[¶ 23] The ordinary meaning of the word "incident" is:

> 1a: occurring or likely to occur esp. as a minor consequence or accompaniment [incident] to a quick change: associated or naturally related or attaching the privileges [incident] to increased rank ... 3 law: dependent on or appertaining to another thing: directly and immediately relating to or involved in something else though not an essential part of it.

*Webster's Third New Int'l Dictionary* 1142 (2002). We cannot say the fees for the payment options Onyx offered to customers occurred or were likely to occur as a consequence of, or accompanied, the dealers' extension of credit to those customers or that the fees were naturally related to the extension of credit. Nor can we conclude the fees were dependent on or directly or immediately related to the extension of credit. Interpreted more broadly, however, the fees would not have arisen without the extension of credit and in that sense were associated with the extension of credit. Either of these varying interpretations is reasonable; therefore, we conclude the phrase "incident

to the extension of credit" is ambiguous.[2]

**** [¶ 24] When statutory language is not clear or is ambiguous, we apply accepted rules of construction to ascertain the legislature's intent. *Daves v. State,* 2011 WY 47, ¶ 15, 249 P.3d 250, 256 (Wyo.2011). We look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances. *Id.*

[¶ 25] The mischief the WUCCC was intended to cure is clearly set forth in Wyo. Stat. Ann. § 40–14–102 (LexisNexis 2011), which provides in relevant part:

(a) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

(b) The underlying purposes and policies of this act are:

(i) To simplify, clarify and modernize the law governing . . . consumer credit . . . ;

(ii) To provide rate ceilings to assure an adequate supply of credit to consumers;

(iii) To further consumer understanding of the terms of credit transactions and to foster competition among suppliers of consumer credit so that consumers may obtain credit at reasonable cost;

(iv) To protect consumer[s] . . . against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors;

(v) To permit and encourage the development of fair and economically sound consumer credit practices;

(vi) To conform the regulation of consumer credit transactions to the policies of the federal Consumer Credit Protection Act [citation omitted]; and

(vii) To make uniform the law, including administrative rules, among the various jurisdictions.

Pursuant to subsections (a) and (b)(ii) through (v), this Court is required to liberally construe the WUCCC so as to promote its underlying purposes of making credit transactions more understandable to consumers, fostering competition among creditors, making credit available to consumers at a reasonable cost, protecting consumers from unfair practices, and encouraging the development of fair and economically sound consumer credit practices. Of equal importance, in accordance with subsection (b)(i), (vi) and (vii), we must construe the statute in a way that simplifies and brings clarity and uniformity to consumer credit law and conforms the regulation of consumer credit transactions to the policies of the Consumer Credit Protection Act.

[¶ 26] Viewed in light of the purposes set forth in subsections (a) and (b)(ii) through (v), we are not convinced the fees for payment by phone or internet are "credit service charges" covered by the WUCCC. Even if the dealers had foreseen the fees at the time they extended credit to the customers, disclosure would not have made the credit transaction more understandable to the customer. Given that the fees were optional, we are not persuaded disclosure would have fostered competition among the dealers. Customers could simply choose not to make their payments by phone or internet. Likewise, the fees were not related to the cost of credit because credit had been made available to

---

**2.** We are not alone in concluding the words "incident to" are ambiguous. In *Household Credit Servs. v. Pfennig,* 541 U.S. 232, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004), the Court considered the definition of "finance charge" in 15 U.S.C. § 1605(a), which is identical to the definition of credit service charge in the WUCCC. The question before the Court was whether, in excluding fees a creditor imposed when credit card holders exceeded their credit limit, 12 CFR § 226.4(a) (2004) (Regulation Z) was an unreasonable interpretation of § 1605 of TILA. *Id.* at 235, 124 S.Ct. at 1744. Looking at the definition of "finance charge" in 15 U.S.C. § 1605(a), the

Court stated the over-limit fee could be characterized as a finance charge because there was at least some connection between it and the extension of credit; however, the fee could also be characterized as a penalty imposed for violating the credit agreement. *Id.* at 240, 124 S.Ct. at 1747. Given these different meanings, the Court concluded the words "incident to" did not make clear whether a substantial connection between the extension of credit and a fee is required for the fee to constitute a finance charge that must be disclosed when credit is extended. *Id.* at 241, 124 S.Ct. at 1748. Thus, it concluded the term finance charge was ambiguous. *Id.*

the customer before Onyx became involved and offered customers the optional payment methods. The fees simply were not terms of the transaction in which the dealers extended credit to customers. Finally, we are unable to see how an offer made by an assignee of the consumer credit contract after the consumer credit sale was completed allowing customers the option of paying by phone or internet for a fee would hinder the development of fair and economically sound consumer credit practices. Construed liberally to promote the purposes and policies of the WUCCC, we conclude the fees are not credit service charges within the meaning of § 40–14–209(a)(i) because they were not "imposed directly or indirectly by the seller as an incident to the extension of credit."

[¶ 27] Section 40–14–207 provides support for this conclusion. Pursuant to that provision, an assignee of the seller's right to payment (such as Onyx) is a "seller" within the meaning of the WUCCC; however, an assignee is not subject to any obligation of the seller with respect to events occurring before the assignment. Thus, the dealer's obligation to disclose charges "imposed as an incident to the extension of credit" cannot be imposed on Onyx because the credit transaction occurred before the contract was assigned to Onyx.

[¶ 28] In concluding that the fees at issue here are not credit service charges, we have also considered the legislative directive that we are to construe the WUCCC liberally to simplify, bring clarity and make uniform consumer credit law and "to conform the regulation of consumer credit transactions to the federal Consumer Credit Protection Act." Section 40–14–102(b)(i), (vi) and (vii). As mentioned in paragraph 12 above, the WUCCC resulted from an effort to create a uniform law governing consumer credit sales transactions and, in enacting our statute, the Wyoming legislature expressly intended the regulation of consumer credit transactions in this State to conform to the policies of the Consumer Credit Protection Act. In accordance with this intent, § 40–14–604, which sets out the powers and duties of the WUCCC Administrator, states in pertinent part:

(b) The administrator shall adopt rules not inconsistent with the federal Consumer Credit Protection Act and rules and regulations of the federal reserve board adopted under it. . . .

(c) To keep the administrator's rules in harmony with the federal Consumer Credit Protection Act [citation omitted] and the regulations prescribed from time to time pursuant to that act by the board of governors of the federal reserve system and with the rules of administrators in other jurisdictions which enact the Uniform Consumer Credit Code, the administrator, so far as is consistent with the purposes, policies and provisions of this act, shall:

(i) Before adopting, amending, and repealing rules, advise and consult with administrators in other jurisdictions which enact the Uniform Consumer Credit Code; and

(ii) In adopting, amending, and repealing rules, take into consideration:

(A) The regulations so prescribed by the board of governors of the federal reserve system; and

(B) The rules of administrators in other jurisdictions which enact the Uniform Consumer Credit Code.

From these provisions, it is clear that conformity with federal law and uniformity with other jurisdictions in which the UCCC has been enacted were important considerations in the decision to adopt the WUCCC.

[¶ 29] Acting in accordance with the legislature's directive, the Administrator has adopted rules and regulations to implement the WUCCC. Among those rules is the following:

## CHAPTER 2

## DISCLOSURE AND ADVERTISING

Section 1. **Authority, Purpose, and Enforcement.**

(a) Authority. W.S. 40–14–102(b)(vi) and (c), 40–14–222(f), 40–14–320(e), and 40–14–604(b) and (c) evidence the clear intent and purpose of the legislature to, whenever practicable, maintain consistency and conform the Code and Rules issued thereun-

der to the Federal Consumer Credit Protection Act and Regulation Z issued by the Board of Governors of the Federal Reserve System.

(b) This Chapter implements the Code, a purpose of which is to assure that every customer who has need for consumer credit is given meaningful information with respect to the cost of that credit which, in most cases, must be expressed in the dollar amount of finance charge, and as an annual percentage rate computed on the unpaid balance of the amount financed. Other relevant credit information must also be disclosed so that the customer may readily compare the various credit terms available to him from different sources and avoid the uninformed use of credit. * * * The Code encompasses many aspects of consumer credit; this Chapter relates primarily to disclosures and advertising for consumer credit necessary to preserve consistency between the Code and the Federal Consumer Credit Protection Act and regulations issued thereunder referred to in Section 2 of this Chapter.

Section 2. **Adoption of Regulation Z.**

(a) Regulation Z, as issued and amended as of October 1, 2011, by the Board of Governors of the Federal Reserve System to implement the Federal Truth in Lending Act, which is contained in Title I of the Consumer Credit Protection Act (15 U.S.C. 1601 et seq.) is hereby adopted as if fully set forth herein, except as otherwise set forth in the Chapter.[3]

Again, these rules reflect a clear mandate to construe the WUCCC, whenever practicable, in a manner consistent with and in conformity with federal law.

[¶ 30] Accordingly, in construing the WUCCC, we must consider the Consumer Credit Protection Act. As we have said, the federal Act was enacted for much the same purposes as the UCCC. Section 1601 provides:

(a) **Informed use of credit**

The Congress finds that economic stabilization would be enhanced and the competition among various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost therefore by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

The Act requires creditors to make "clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, 118 S.Ct. 1408, 1410, 140 L.Ed.2d 566 (1998).

[¶ 31] Section 1605(a) is the federal counterpart to the WUCCC's § 40–14–209, although it uses the term "finance charge" rather than "credit service charge." Under the federal act, a "finance charge" in connection with consumer credit transactions is "the sum of all charges, payable directly or indirectly by the person to whom credit is extended, and *imposed directly or indirectly by the creditor as an incident to the extension of credit.*" 15 U.S.C. § 1605(a) (emphasis added.) Thus, the definition of "finance charge" in the federal law is identical to the definition of "credit service charge" in the WUCCC.

[¶ 32] Just as the Administrator has authority to promulgate rules to carry out the provisions of the WUCCC, Congress has delegated broad authority to the Federal Reserve Board (Board) to enact regulations to advance the Consumer Credit Protection Act's purposes of promoting the informed

---

**3.** The only exception identified is as follows:

Section 3. **Provisions of Regulation Z modified or not adopted.**

(a) The following sections of Reg. Z are hereby modified:

(i) The disclosures required under Section 226.13 of Reg. Z are not adopted by these Rules because Wyoming had not adopted the Fair Credit Billing Act, 15 U.S.C. 1666.

use of credit by consumers and ensuring meaningful disclosure of credit terms. 15 U.S.C. § 1601(a) and § 1604(a). The Board enacted Regulation Z in part to clarify that the term "finance charge" as used in the Act means "the cost of consumer credit as a dollar amount" and "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to *or a condition of* the extension of credit." 12 CFR § 226.4(a) (2004) (emphasis added.) Applying this definition to the circumstances before us, it is clear that the fees for the optional payment methods Onyx offered after the credit transaction between the automobile dealers and their customers was completed were not a condition of the extension of credit.[4]

[¶ 33] Having concluded the fees are not credit service charges within the meaning of the WUCCC, we turn to consideration of the Administrator's contention that the fees were impermissible because they are not among the charges enumerated and, by enumerating specific allowable charges, the legislature intended to prohibit the imposition of any other charges. This contention suffers from the same difficulty as the claim that the fees are credit service charges. The WUCCC, like its federal counterpart, was intended to promote the informed use of credit and to protect consumers from unfair credit practices by requiring meaningful disclosure of credit terms. Put simply, the consumer is entitled to know the terms on which a lender will extend him credit. The ordinary meaning of the word "terms" is: "provisions that determine the nature and scope of an agreement:

conditions." *Webster's Third New Int'l Dictionary* 2358 (2002). The fees Onyx charged those customers opting to pay by phone or internet were not provisions of the credit transaction that determine the nature and scope of the agreement; they were not conditions of the credit transaction.

[¶ 34] In *Pfennig,* 541 U.S. at 243, 124 S.Ct. at 1749, the Court stated as follows:

The [Federal Reserve] Board adopted [Regulation Z] to emphasize *"disclosures that are relevant to credit decisions, as opposed to disclosures related to events occurring after the initial credit choice...."* 45 Fed. Reg. 80649 (1980). The Board's decision to emphasize *disclosures that are most relevant to a consumer's initial credit decisions* reflects an understanding that *"meaningful disclosure does not mean more disclosure,"* but instead "describes the balance between 'competing considerations of complete disclosure ... and the need to avoid ... [information overload].'"

(emphasis added).

[¶ 35] *Pfennig* involved a regulation expressly excluding from the term "finance charge" fees assessed on credit card holders for exceeding their credit limits. The question there was whether the regulation excluding from the term "finance charge" fees for exceeding credit card limits was inconsistent with the statutory definition of finance charge. Here, there is no rule or regulation expressly excluding fees for payment by phone or internet from the definition of

---

4. 12 C.F.R. Ch. II § 226.29 allows a State to apply to the Board to exempt a class of transactions within the State from the requirements of the credit transactions and billing provisions of the Consumer Credit Protection Act and corresponding regulations. The Board is required to grant an exemption if it determines that:

(1) The State law is substantially similar to the Federal law or, in the case of [credit billing], affords the consumer greater protection than the Federal law; and

(2) There is adequate provision for enforcement.

Wyoming applied for and received an exemption from the credit transactions provisions of the federal act in 1982. 12 C.F.R. Ch. II, Pt. 226, Supp. 1, Section 226.29, p. 738. The exemption means creditors in Wyoming are subject to the requirements of the WUCCC rather than the federal act. The idea behind allowing States to be exempted was to create a uniform law administered by the States. *Ives v. W.T. Grant Co.,* 522 F.2d 749, 755 (2d Cir.1975). The exemption does not affect the close connection between the federal act and the WUCCC nor does it mean federal law is no longer relevant in interpreting the WUCCC. To the contrary, interpretations of the federal act remain highly persuasive in interpreting the WUCCC. As demonstrated in the regulation quoted above, the very reason the Board granted the exemption is because it found the WUCCC to be substantially similar to, or "generally the same as" the federal law. *Id.* at 737. The substantial similarity is shown in Wyoming's adoption and incorporation of Regulation Z in its own rules.

"credit service charge" and we are not asked to resolve an alleged inconsistency between a regulation and a statute. To that extent *Pfennig* is different from the case before this Court. That difference aside, we are persuaded, as the *Pfennig* court was, that the effort to promote the informed use of credit was focused on requiring disclosure of information "most relevant to a consumer's initial credit decisions, as opposed to disclosures related to events occurring after the initial credit choice." We agree that "meaningful disclosure does not mean more disclosure," and some fees are "less relevant to determining the true cost of credit." The fees for optional payment methods at issue in this case are among those less relevant to determining the true cost of credit.

[¶ 36] Other courts have reached this same conclusion. In *McGee v. Kerr–Hickman Chrysler Plymouth, Inc.*, 93 F.3d 380 (7th Cir.1996), for example, a used car buyer purchased optional insurance to avoid the risk of having to pay the difference between the balance owed on the credit sale contract and the car's cash value if it was stolen or destroyed. In determining whether the dealer should have disclosed the cost of the insurance as part of the finance charge pursuant to 15 U.S.C. § 1605(a), the court concluded it was not a charge payable "as an incident to the extension of credit" because it did not affect the terms of the credit deal between the buyer and seller. *Id.* at 383. The Court reasoned that the Consumer Credit Protection Act's purpose of "assuring consumers an opportunity for meaningful comparison of different available credit terms is not undermined unless the argued-for disclosure actually involves credit terms." *Id.* at 385. Applying this reasoning to the fees at issue here, they were not incident to the extension of credit because they were not credit terms; they did not affect the terms of the credit deal between the dealerships and their customers.

[¶ 37] In reaching this result, we do not blindly follow federal precedent. We are appreciative that consistency and conformity are desirable "whenever practicable." Wyoming Rules of the Administrator, Chapter 2, § 1(a). However, "when the words of a statute [or rule] are materially the same and where the reasoning of another court interpreting the statute [or rule] is sound, we do not sacrifice sovereign independence, nor undermine the unique character of Wyoming law, by relying upon the precedent of [another] jurisdiction." *Iberlin v. TCI Cablevision*, 855 P.2d 716, 726 (Wyo.1993). This is particularly true when we are asked to interpret or construe a statute that was intended to bring consistency and uniformity to the area of law addressed.

[¶ 38] In considering the WUCCC, we have not limited our research to federal cases but have looked to court decisions from other states in which the UCCC has been adopted. Although we have found no case involving fees like those at issue here, it seems clear that state courts generally have interpreted the UCCC as requiring meaningful disclosure of terms relevant to the cost of credit. In *Barnes v. Helfenbein*, 548 P.2d 1014 (Okla.1976), for example, the Oklahoma Supreme Court had before it the question of whether a loan fell within Oklahoma's version of the UCCC and, if so, whether the interest rate the lender charged exceeded the maximum allowable amount. Addressing the OUCCC generally the court stated:

> The delineation of exact charges by the legislature was deemed appropriate in consumer lending transactions in the exercise of a legislative desire to regulate practices by lenders active in the areas of consumer finance where an individual borrower is without the bargaining power *to adequately discover the interest rate being charged or bargain for charges which are reasonable under the circumstances.*

*Id.* at 1017 (emphasis added). These considerations do not come into play where, as here, the consumers knew the interest rate being charged and had the power to decline the fees for payment by phone or internet if they found the fees unreasonable.

[¶ 39] Other state courts have interpreted the UCCC as requiring disclosure of the amount of the loan or debt, together with the charges imposed on the consumer as terms of the credit transaction. Among those terms, courts have included: the annual percentage rate of interest, *Knox v. Thomas*, 30

Utah 2d 15, 512 P.2d 664 (1973), *Strader v. Beneficial Finance Co.*, 35 Colo.App. 284, 534 P.2d 339 (1975); the right to rescind the transaction, *Varady v. White*, 661 P.2d 284 (Colo.App.1982); a written description of insurance when it is part of the agreement, including the type and amount of coverage and, if a separate charge is made for the insurance, the amount of that charge, *Bair v. Public Service Employees Credit Union*, 709 P.2d 961, 962 (Colo.App.1985), *Means v. Indiana Financial Corp.*, 416 N.E.2d 896 (Ind.App.1981). We have found no court decision interpreting the UCCC to require disclosure of fees such as those at issue here, which were not terms or conditions of the extension of credit and were offered after the credit sales contracts were consummated and assigned to Onyx.

[¶ 40] As support for his position, the Administrator cites *Luttenegger v. Conseco Fin. Servicing Corp.*, 671 N.W.2d 425 (Iowa 2003), which involved a consumer loan transaction under Part 3 of the UCCC rather than a consumer credit sale under Part 2. The definition of "loan finance charge" in Part 3 is identical in all relevant respects to the definition of "credit service charge" in Part 2. The consumers alleged the creditor charged a loan origination fee, loan processing fee and a courier fee not permitted by the Iowa Uniform Consumer Credit Code (IUCCC). The creditor responded that the fees were allowable as part of the finance charge. The consumers countered that the fees were not part of the finance charge because they were not specifically mentioned in the definition of finance charge and the IUCCC allowed only those fees expressly enumerated.

[¶ 41] The Iowa Supreme Court held that the IUCCC did not prohibit the fees; rather, they were included within the term "finance charge" even though they were not expressly mentioned in the statute. In reaching this result, the Court considered the definition of finance charge—"the sum of all charges payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit ..., including any of the following types of charges which are applicable: [list of four charges]." Iowa Code § 537.1301(21)(a). None of the disputed fees were listed among those included within the definition of finance charge.

[¶ 42] The Court interpreted the provision to mean that the term "finance charge" included but was not limited to the charges listed; that is, the Court concluded, the list was intended to be non-exclusive. As long as the finance charge did not exceed 21% per year on the unpaid balance of the amount financed, the amount allowed under § 537.2401(1), such other fees as those in dispute were to be treated as part of the finance charge. Because the finance charge combined with the three disputed fees did not exceed the amount allowed, the Court held the IUCCC was not violated.

[¶ 43] The Administrator asserts *Luttenegger* supports its position that the WUCCC authorizes only the charges expressly enumerated. In order to be permissible under the WUCCC, he contends, fees must be either credit service charges, and disclosed as such, or they must be contracted for additional, delinquency, deferral or default charges. Again, no one contends the fees for payment by phone or internet were contracted for additional, delinquency, deferral or default charges. Therefore, under the Administrator's interpretation, our conclusion that the fees also are not credit service charges would seem to lead to the conclusion that they are not authorized by the WUCCC.

[¶ 44] *Luttenegger* involved fees that were imposed as part of the loan transaction. Stated differently, they were incurred by the debtor "for the privilege of obtaining the loan." *Id.* at 432, quoting Robert L. Jordan & William D. Warren, *The Uniform Consumer Credit Code*, Colum. L. Rev., 382, 396 (1968). They were not fees associated with optional offers made to customers after the credit transaction had been consummated and the creditor had assigned the contract to someone else. *Luttenegger*, therefore, is distinguishable. To reiterate, the fees at issue here are not among those most relevant to "a consumer's initial credit decision." *Pfennig*, 541 U.S. at 243, 124 S.Ct. at 1749. We hold they are not the sort of charges the legislature intended the WUCCC to address.

[¶ 45] Onyx did not violate the WUCCC in charging fees to consumers who opted to make payments on their consumer credit contracts by phone or internet. The district court properly ordered summary judgment in favor of Onyx. We remand the case to the district court with instructions to remand the case to the Administrator for entry of a summary judgment order for Onyx.